425 F.3d 23
 UNITED STATES of America, Appellee,
v.
Angel CASAS, Defendant, Appellant.
United States of America, Appellee,
v.
Jose Bonilla-Lugo, Defendant, Appellant.
United States of America, Appellee,
v.
John Correy, a/k/a Earth, Defendant, Appellant.
United States of America, Appellee,
v.
Angel Luis Pizarro-Morales, a/k/a Wee, Defendant, Appellant.
United States of America, Appellee,
v.
Ramon Flores-Plaza, Defendant, Appellant.
United States of America, Appellee,
v.
Raymond Nicolai-Cabassa, a/k/a Ray, Defendant, Appellant.
 No. 02-1677.
 No. 02-1717.
 No. 02-1708.
 No. 02-1716.
 No. 02-1996.
 No. 02-1997.
 No. 02-2124.
 United States Court of Appeals, First Circuit.
 Heard March 7, 2005.
 Decided October 7, 2005.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Luis M. Cháves-Ghigliotty, for appellant Angel Casas.
 Terrance J. McCarthy, for appellant José Bonilla-Lugo.
 Donna R. Newman, for appellant John Correy.
 Mauricio Hernández-Arroyo, for appellant Angel Luis Pizarro-Morales.
 Rodney S. Dowell, with whom Berman & Dowell, was on brief, for appellant Ramón Flores-Plaza.
 Linda George, for appellant Raymond Nicolai-Cabassa.
 Miguel A. Fernández, with whom Lisa Snell-Rivera, Assistant United States Attorneys, and H.S. García, United States Attorney, were on brief, for appellee.
 Before TORRUELLA, LYNCH and LIPEZ, Circuit Judges.
 TORRUELLA, Circuit Judge.
 
 
 1
 Appellants were convicted of conspiracy to possess with intent to distribute approximately 1400 grams of heroin and 9445 kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. They now challenge their convictions and their sentences. We affirm their convictions but vacate their sentences and remand for re-sentencing.
 
 I. Background
 
 2
 On May 21, 1994, Special Agents Jay Stoothoff ("Agent Stoothoff") of the Drug Enforcement Administration ("DEA") and Richard Escalera of the Immigration and Naturalization Service were conducting surveillance at the Luis Muñoz Marín International Airport in Carolina, Puerto Rico. They saw two vehicles, a Pontiac TransAm carrying four people and an Isuzu Trooper carrying two people, pull up to the departure area together. After observing suspicious interactions between certain passengers of the vehicles and American Airlines employees, the agents approached the vehicles and identified themselves as police officers. One of the individuals fled on foot, while two individuals sped away in the TransAm. The Trooper was left with the doors open and engine running, and the agents detained the other three individuals. The agents secured four suitcases from the scene. These suitcases were found to contain eighty-one kilograms of cocaine. One of the detained individuals, Héctor Martínez-Medina ("Martínez-Medina"), accompanied the agents to a house where all six individuals met prior to going to the airport. The house belonged to the father of Israel Pérez-Delgado ("Pérez"). The Isuzu Trooper was registered to Pérez.[1]
 
 
 3
 This series of events eventually led to the exposure of the drug conspiracy that gave rise to this case. On August 8, 1996, the grand jury returned a six-count superseding indictment against sixty defendants, including appellants. Count One of the indictment charged all the defendants with conspiracy to possess with intent to distribute approximately 1400 grams of heroin and 9445 kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846. Count Two charged appellant Angel Luis Pizarro ("Pizarro") and various co-defendants not part of this appeal with possession with intent to distribute approximately eighty-one kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count Three did not charge any of the appellants. Count Four charged appellants John Correy ("Correy") and Raymond Nicolai-Cabassa ("Nicolai"), as well as co-defendant Thomas Martínez ("Martínez"), who is not part of this appeal, with possession with intent to distribute approximately thirty-six kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Counts Five and Six charged Correy and Nicolai with the intentional killings of José Miguel Blanco-Rodríguez ("Blanco") and Ramón de Jesús-Molina ("de Jesús").
 
 
 4
 United States District Judge Carmen Consuelo Vargas de Cerezo presided over a jury trial for ten of the co-defendants, including appellants, in the United States District Court for the District of Puerto Rico. Trial began on May 12, 1999 and lasted approximately seven months. The jury convicted all of the appellants of Count One, convicted Pizarro of Count Two, acquitted Correy of Count Four, and acquitted Correy and Nicolai of Counts Five and Six.
 
 
 5
 On April 17, 2002, pursuant to an order of the First Circuit Judicial Council, the case was reassigned to the Honorable Héctor M. Laffitte for sentencing. Judge Laffitte sentenced the appellants on various dates between May 7, 2002 and July 18, 2002. Appellants have timely appealed both their convictions and their sentences to this court.
 
 II. Discussion
 
 6
 Appellants challenge their convictions and sentences on numerous grounds. We address each of these grounds in turn.[2]
 
 A. Conviction
 1. Delay
 
 7
 Appellants Correy, Pizarro, and Nicolai argue that their convictions should be reversed and the indictments against them dismissed because the delay between their indictment and trial violated their rights under the Speedy Trial Act ("STA"), 18 U.S.C. § 3161, and the Sixth Amendment of the Constitution. Appellants were originally indicted on December 13, 1995, and a superseding indictment was filed on August 8, 1996. Trial commenced on May 12, 1999, approximately forty-one months after appellants were indicted.
 
 
 8
 a. Speedy Trial Act
 
 
 9
 We review decisions on issues of fact relevant to the STA for clear error and review questions of law de novo. United States v. Maxwell, 351 F.3d 35, 37 (1st Cir.2003). The STA requires that trial commence within seventy days of the filing of an indictment, or the first appearance of the defendant in court, whichever is later. 18 U.S.C. § 3161(c)(1). Periods of delay arising from the causes outlined at 18 U.S.C. § 3161(h)(1)-(9) are excluded from the calculation. Included in these periods of delay are those "resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." Id. § 3161(h)(1)(F). If trial does not commence by the end of seventy days plus the excluded periods, the "indictment shall be dismissed on motion of the defendant." Id. § 3162(a)(2). Nicolai moved to dismiss on the basis of an STA violation on March 3, 1998, and Pizarro claims to have joined the motion.[3] Correy filed a pro se motion to dismiss for delay on July 22, 1998 and moved to dismiss for lack of prosecution and violation of the Sixth Amendment on April 30, 1999. Although Correy's motions never mentioned the STA by name, we will assume, as did the prosecution and district court, that his motions were sufficient for purposes of § 3162(a)(2). Our review of the district court's refusal to dismiss the indictment turns on whether delays resulting from the pendency of motions filed by appellants and their co-defendants are excluded from the seventy-day limit.
 
 
 10
 Appellants each claim that the STA clock began running on their respective dates of first appearance, and that the seventy-day deadline was far exceeded. However, among the periods excluded from the STA limit are "reasonable period[s] of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." Id. § 3161(h)(7). The Supreme Court has interpreted this section to mean that the clock does not, in effect, begin to run until the date of the most recent defendant's initial appearance before the court. See Henderson v. United States, 476 U.S. 321, 323 n. 2, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986) (finding that STA clock begins on the date of last co-defendant's arraignment because "[a]ll defendants who are joined for trial generally fall within the speedy trial computation of the latest codefendant") (citing 18 U.S.C. § 3161(h)(7)); United States v. Barnes, 251 F.3d 251, 257-59 (1st Cir.2001) (applying Henderson to find that district court properly reset STA clock on date superseding indictment was filed to add a new defendant); see also United States v. Maxwell, 351 F.3d 35, 38 (1st Cir.2003) (applying Barnes to find that period between appellant's arraignment and co-defendant's later arraignment is excluded from STA calculation). Appellants were among ten defendants severed for trial from the remaining fifty who were charged in the superseding indictment. The last of these ten to appear before the court was Nicolai, on November 6, 1996. Accordingly, the STA clock started no earlier than that date, 917 days before trial.[4]
 
 
 11
 Our precedent makes clear that "any defendant's motion resulting in excludable time toll[s] the STA clock for his codefendants." United States v. Santiago-Becerril, 130 F.3d 11, 19 (1st Cir.1997) (collecting cases). Accordingly, the government argues that delays during the pendency of motions filed by appellants' co-defendants must be excluded from the STA calculation. See 18 U.S.C. § 3161(h)(1)(F), (h)(7). The government argues that once the delays during the pendency of motions filed by appellants' co-defendants are counted, fewer than seventy non-excludable days accrued. Unfortunately, the government neglected to provide this court with the dates or length of any delays so occasioned during the more than two-year interval between Nicolai's initial appearance and trial.[5]
 
 
 12
 This case began with sixty co-defendants, a number that was cut down to ten by the time of trial. The co-defendants filed numerous motions, and there were also many hearings and appearances before the district court prior to trial. After carefully examining the record, we have concluded that such motions and proceedings tolled the STA for the bulk of the time between Nicolai's initial appearance and trial. The number of non-excludable days for STA purposes, due to the various motions and hearings, was far less than seventy.[6]
 
 
 13
 Appellants Pizarro and Nicolai argue that the exclusion of delays during the pendency of a co-defendant's motion must be reasonable, see 18 U.S.C. § 3161(h)(7), and therefore other considerations — such as whether the defendant seeking dismissal asserted his speedy trial rights or contributed to the delay — play a role in calculating the number of excludable days. Defendants rely on Barnes. See 251 F.3d at 259 (finding no STA violation but noting that "[t]he Henderson rule anticipates exceptions" and that "in other, less exigent circumstances, the clock may not prove to be so elastic"). According to appellants, because they did not contribute to their delay and because they asserted their speedy trial rights, their STA clocks should be considered separately from the clocks of their co-defendants. Appellants have not argued that the joining of various co-defendants for trial was unreasonable for STA purposes.
 
 
 14
 Appellants' reliance on Barnes is misplaced, and their claims that they were not responsible for any delays are inaccurate. Barnes involved the re-trial of a defendant after this court vacated her original conviction and ordered her indictment dismissed without prejudice because the government had violated the STA. See id. at 254. A grand jury promptly issued a second indictment. One day before the defendant-appellant's STA deadline, a grand jury issued a superseding indictment that added a second defendant. This court found no STA violation but expressed concern because the government, "after once violating the appellant's STA rights, . . . filed the superseding indictment only one day before the STA clock was to expire again." Id. at 259 (emphasis in original). In other words, the Barnes court was concerned with the appearance of possible manipulation of the STA by the government. In the instant case, however, the causes of delay were the numerous motions filed by the co-defendants, including appellants Pizarro and Nicolai, who between them filed at least thirty-six motions from November 6, 1996 through May 12, 1999, the date trial began.
 
 
 15
 Further, Barnes involved the joining of a co-defendant, not the filing of pretrial motions, and therefore concerned § 3161(h)(7), not § 3161(h)(1)(F). The Supreme Court has interpreted § 3161(h)(1)(F) not to have any "reasonableness" requirement such as the one present in § 3161(h)(7). See Henderson, 476 U.S. at 326-28, 106 S.Ct. 1871; Maxwell, 351 F.3d at 38. Therefore, appellants' argument that delays caused by pretrial motions filed by their co-defendants were unreasonable finds no support in Barnes and has been rejected by the Supreme Court in Henderson.[7]
 
 
 16
 Due to the pendency of motions filed by co-defendants, the number of non-excludable days for STA purposes between Nicolai's indictment and trial was less than seventy. Accordingly, no STA violation occurred.
 
 
 17
 b. Sixth Amendment
 
 
 18
 Although unusual, it is possible for a delay that does not violate the STA to run afoul of the Sixth Amendment's guarantee of a speedy trial. United States v. Salimonu, 182 F.3d 63, 69 (1st Cir.1999); see also 18 U.S.C. § 3173 (STA not a bar to Sixth Amendment claim). Appellants allege that delays between their indictment and trial, and between their conviction and sentencing, violated the Sixth Amendment's guarantee of "a speedy and public trial." U.S. Const. amend. VI.
 
 
 19
 In Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme Court identified four factors to be considered in determining whether an appellant's speedy trial rights have been violated: (1) the length of the delay, (2) the reasons for the delay, (3) the defendant's assertion of his speedy trial right, and (4) prejudice to the defendant caused by the delay. Id. at 530-32. However, "none of the four factors . . . [is] either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." Id. at 533.
 
 
 20
 The length of pretrial delay is calculated from either arrest or indictment, whichever occurs first. See United States v. Muñoz-Amado, 182 F.3d 57, 61 (1st Cir.1999). Correy and Pizarro were both indicted prior to their arrest, in December 1995. Nicolai was arrested on November 6, 1996, although he was already incarcerated in New York after having pled guilty to unrelated charges. Thus, all three waited over forty months for trial. This time period far exceeds the one-year point at which pretrial delay is generally considered to be presumptively prejudicial. See Santiago-Becerril, 130 F.3d at 21-22 (quoting Doggett v. United States, 505 U.S. 647, 652 n. 1, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992)). Accordingly, the length of delay weighs in favor of appellants' claim of a Sixth Amendment violation.
 
 
 21
 The second factor, however, weighs against appellants. They allege that the delay was caused largely by the unpreparedness of the government, and the inability of the judicial system to cope with their case. We disagree. Sixty people were indicted in this large, complex drug conspiracy case. Well over 350 pretrial motions were filed between the initial indictment and trial. Pizarro filed thirteen pretrial motions, including two motions to continue the trial (Docket No. 504, 531);[8] two motions to change his plea (Docket Nos. 701, 916), each of which was withdrawn months later, shortly before the scheduled change of plea hearing (Docket Nos. 766, 974); and three motions for his court-appointed attorney to withdraw (Docket Nos. 635, 746, 974), resulting in additional delay while a new attorney was appointed. Correy filed nineteen pretrial motions, including one to continue the trial. (Docket No. 533).[9] Nicolai filed twenty-eight pretrial motions, including two for a continuance or severance. (Docket No. 532, 1040).
 
 
 22
 Appellants have alleged no bad faith effort by the government to delay the proceedings. Nor do we agree with appellants' assertion that the delay was caused by the judicial system's inability to cope with a case this size. From our review of the record, the district court disposed of the co-defendants' numerous motions in a timely manner and moved the case along to trial. Instead, it appears that delays were due in large part to the resolution of pre-trial matters concerning appellants and their co-defendants.[10] Further, while a case of this size is certainly unwieldy, the joint prosecution of defendants involved in the same drug trafficking conspiracy is justified as a means of serving the efficient administration of justice. Accordingly, we find that the reasons for the delay are sound and weigh against a finding of Sixth Amendment violation.
 
 
 23
 With regard to the third factor, the government concedes that all three appellants asserted their speedy trial rights in motions filed with the district court. We find, therefore, that the third factor weighs in appellants' favor.
 
 
 24
 We evaluate the fourth factor, prejudice, "in the light of the interests of defendants which the speedy trial right was designed to protect[:] . . . (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." Barker, 407 U.S. at 532, 92 S.Ct. 2182. All three appellants were detained for more than forty-one months prior to trial and likely experienced the disadvantages thereof identified by the Supreme Court in Barker, such as idleness, loss of employment, and disruption of family relationships.[11] Id. Lengthy detention is not necessarily, however, "[ ]sufficient to establish a constitutional level of prejudice." Santiago-Becerril, 130 F.3d at 23 (finding fifteen months' pretrial detention insufficient to establish prejudice); see also Barker, 407 U.S. at 533-34, 92 S.Ct. 2182 (finding that "prejudice was minimal" despite "extraordinary" five-year delay because defendant was only held in pretrial detention for ten months).
 
 
 25
 The fact that appellants' detention was forty-one months (almost three times the length considered in Santiago-Becerril) causes us great concern. However, we believe that other counterbalancing factors outweigh this deficiency and prevent constitutional error. Appellants have not alleged that the conditions of their confinement were unduly oppressive, and the time served was credited against the sentences they received upon conviction. Cf. Barker, 407 U.S. at 533, 92 S.Ct. 2182 (stating that "[i]t is especially unfortunate to impose [the disadvantages of pretrial detention] on those persons who are ultimately found to be innocent"). Moreover, at least some of the delay during appellants' pretrial detention was attributable to their own actions, insofar as the many motions they filed required consideration and disposition by the district court.
 
 
 26
 Appellants also allege that they suffered prejudice in the form of "anxiety and concern," id. at 532, about the outcome of the proceedings. However, "[w]hile this type of prejudice is not to be brushed off lightly, considerable anxiety normally attends the initiation and pendency of criminal charges; hence only undue pressures are considered." United States v. Henson, 945 F.2d 430, 438 (1st Cir.1991) (internal quotation marks and citations omitted); see also United States v. Colombo, 852 F.2d 19, 25 (1st Cir.1988) (emphasizing that Barker requires minimization, not elimination, of "the natural consequences of an indictment"). Correy and Nicolai both claim that, because they were indicted on murder charges, they experienced heightened concern that they might have to defend themselves against a death sentence, and Correy claims that he was distracted thereby from preparing his defense on other charges. See 21 U.S.C. § 848(e) (providing for death penalty). The government, however, never filed notice that it would seek the death penalty. See 18 U.S.C. § 3593. Accordingly, we think that the potential anxiety arising from Correy and Nicolai's indictment on a death-eligible charge was minimized and did not exert "undue pressure" upon them.
 
 
 27
 Finally, Nicolai and Pizarro claim that their defense was impaired as a result of the delay between indictment and trial. The Supreme Court identified this as "the most serious [consequence of delay] . . . because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Barker, 407 U.S. at 532, 92 S.Ct. 2182. In particular, Nicolai notes that government agents' debriefing notes of government witness José Vélez-Román ("Vélez") were unavailable because they had been destroyed by Hurricane George in 1998, and that he was unable to present Alexandra Brocksman as a defense witness because she became ill. We note that the issue of the missing notes came up at trial while Pizarro's counsel, not Nicolai, was cross-examining a government witness. Nicolai does not appear to have ever sought access to the notes and has not explained how the destruction of the notes prejudiced him in any way. Regarding the availability of Alexandra Brocksman, Nicolai has not explained how the passage of time prevented him from calling Brocksman as a witness. We note also that, while Nicolai states in his brief that Brocksman did not appear because she was ill, he alleged below that Pérez had threatened Brocksman prior to her failure to appear as a defense witness. See United States v. Nicolai-Cabassa, No. 95-405 (D.P.R. Dec. 9, 1999) (order requiring transcript of Nicolai's statement regarding alleged threats made by Pérez to Brocksman). Further, the parts of the record Nicolai cites in his brief do not even mention Brocksman at all. For these reasons, we are unable to see how these alleged instances were either tied to passage of time or prejudiced Nicolai in any way.
 
 
 28
 Both Nicolai and Pizarro claim that the principal government witness, Pérez, blamed the passage of time for his inability to recall certain details of the drug conspiracy he ran. However, "the clouded recollection of a key prosecution witness would seem to be helpful, rather than harmful, to the defense." Rashad v. Walsh, 300 F.3d 27, 42-43 (1st Cir.2002); see also United States v. Casas, 356 F.3d 104, 113 (1st Cir.2004) (holding that diminished witness recall resulting from delay "`is a two-edged sword . . . [because] [i]t is the Government that bears the burden of proving its case beyond a reasonable doubt'") (quoting United States v. Loud Hawk, 474 U.S. 302, 315, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986)). Indeed, two of Pérez's eight references to the time lapse identified by appellants are taken from cross-examinations that focused specifically on discrediting Pérez's testimony on the basis of his inability to recall specific details. (TT 6/7/99: 84-89; TT 6/9/99: 51-53). We cannot conclude that appellants suffered any prejudice as a result of Pérez's limited recollection.
 
 
 29
 The forty-one months that passed between appellants' initial indictment and trial constituted an unusually long wait, particularly for defendants held in pretrial detention. Nevertheless, under the circumstances, we find that the large and complex nature of the proceedings and the district court's obligation to consider the multitude of pretrial matters filed by appellants and their co-defendants are compelling reasons for the lengthy delay, and that appellants did not suffer prejudice of a constitutional dimension as a result thereof. We conclude that there was no violation of the Sixth Amendment as a result of pretrial delay.
 
 
 30
 Finally, Pizarro and Nicolai argue that the delay between their conviction and sentencing resulted in a denial of their Sixth Amendment rights. They were sentenced on July 11 and July 31, 2002, respectively, approximately thirty-one months after their December 14, 1999 convictions. While "[t]he Supreme Court has not definitively held that [the right to a speedy trial] extends to the sentencing phase," United States v. Nelson-Rodríguez, 319 F.3d 12, 60 (1st Cir.2003) (citing Pollard v. United States, 352 U.S. 354, 361, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957)), we will assume, without deciding, that it does. See id.; see also Fed.R.Crim.P. 32(b)(1) (sentence must be imposed "without unnecessary delay"). While the delay between conviction and sentence was, again, unusually long in this case, it was not without good reason. It was necessary for transcripts of the seven-month trial to be prepared and reviewed in order to produce pre-sentence reports (PSRs) for the defendants. In addition, a number of post-trial motions were filed by appellants and their co-defendants. Nicolai filed twenty-two motions following his conviction, at least three of which requested continuances or extensions of time. Pizarro filed seventeen motions, requesting seven continuances or extensions of time. Neither appellant claims to have asserted a constitutional right to a speedy sentence. Nor do they explain what prejudice resulted from the delay, except to suggest that they were prejudiced by having to wait to file the instant appeal. We are not convinced that they were prejudiced, especially since some of the sentencing delay was to give defendants the opportunity to file Rule 29 motions for acquittal and motions for a new trial, which might have mooted the appeal had they been successful. Thus, we find that the delay between appellants' conviction and sentencing caused no violation of their rights under the Sixth Amendment.
 
 
 31
 c. Motion to sever
 
 
 32
 Nicolai filed two motions for severance (Docket Nos. 532, 1040), one of which was noted but never ruled on (Docket No. 540), while the other was denied without prejudice pending refiling on December 29, 1998. (Docket No. 1074). The renewed motion was again denied on March 12, 1999 for failure to comply with the order providing an opportunity to amend the earlier motion. Nicolai claims that the district court erred in denying his motions for severance.
 
 
 33
 We review the denial of a motion to sever for abuse of discretion. United States v. Soto-Beníquez, 356 F.3d 1, 29 (1st Cir.2004).
 
 
 34
 To demonstrate abuse of discretion, defendants must show that joinder deprived them of a fair trial, resulting in a miscarriage of justice. Because the general rule is that those indicted together are tried together to prevent inconsistent verdicts and to conserve judicial and prosecutorial resources, severance is particularly difficult to obtain where, as here, multiple defendants share a single indictment.
 
 
 35
 Id. (internal citations omitted). See generally Zafiro v. United States, 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) (noting "a preference in the federal system for joint trials of defendants who are indicted together").
 
 
 36
 Nicolai claims to have been prejudiced by delay that resulted from being tried jointly with multiple co-defendants and points to the faster resolution of the trials of other co-defendants who were severed before trial. Regardless of whether Nicolai's trial might have been speedier had it been severed, the delays did not cause significant prejudice, nor did they result in the denial of a fair trial or a miscarriage of justice. See United States v. LiCausi, 167 F.3d 36, 48-49 (1st Cir.1999) (determining that appellant must show "`prejudice greater than that which necessarily inheres whenever multiple defendants. . . are jointly tried'") (quoting United States v. Walker, 706 F.2d 28, 30 (1st Cir.1983)). We therefore find no abuse of discretion in the district court's denial of Nicolai's motions to sever.
 
 2. Grand jury proceedings
 
 37
 Casas and Bonilla-Lugo ("Bonilla") seek dismissal of the indictment, arguing that the prosecutor engaged in misconduct before the grand jury by failing to disclose the existence of alleged secret agreements with Pérez and Martínez for immunity for the Blanco and de Jesús murders, and by knowingly presenting false testimony. Casas argues that the false testimony came in the form of conflicting accounts of the murders from Pérez and Martínez, while Bonilla bases his argument on statements Martínez made at trial that were not made in his grand jury testimony.[12] Casas also outlines each overt act in which he was implicated, challenging the sufficiency of the evidence to support his participation.
 
 
 38
 The petit jury's finding beyond a reasonable doubt that appellants were guilty of the charges alleged in the indictment "demonstrates a fortiori that there was probable cause to charge the defendants with the offenses for which they were convicted." United States v. Mechanik, 475 U.S. 66, 67, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986). Accordingly, "all but the most serious errors before the grand jury are rendered harmless by a conviction at trial." Soto-Beníquez, 356 F.3d at 25 (internal quotation marks omitted). "`Only a defect so fundamental that it causes the grand jury no longer to be a grand jury, or the indictment no longer to be an indictment' is sufficient to invalidate a subsequent conviction." Id. (quoting United States v. Reyes-Echevarría, 345 F.3d 1, 4 (1st Cir.2003)). None of the alleged errors before the grand jury rose to this level.
 
 
 39
 With regard to the first claim, we note that the government denies the existence of any immunity agreements for the murders prior to the creation of supplemental cooperation agreements during trial. See infra at 33-38. Even if we were to assume that the agreements did exist, the prosecution's failure to notify the grand jury thereof would not warrant dismissal of the indictment. Because of the nature of the grand jury's function, "[t]he prosecutor before a grand jury is not normally under a duty to disclose exculpatory evidence. Nor . . . is the prosecutor obligated to impeach the credibility of his own witnesses." United States v. Latorre, 922 F.2d 1, 7 (1st Cir.1990) (internal quotations omitted). Moreover, the petit jury's conviction on the conspiracy count, made with knowledge that Pérez and Martínez were immune at trial and believed themselves to have been immune prior to trial for liability for the murders, leads us to seriously doubt "that a similarly informed grand jury would not have found probable cause." United States v. Mangual-Corchado, 139 F.3d 34, 42 (1st Cir.1998).
 
 
 40
 Next, neither the fact that the accounts of Pérez and Martínez contradicted each other in certain respects, nor that Martínez's trial testimony went beyond the scope of his grand jury testimony, indicate that the prosecutor knowingly presented false testimony. See United States v. Lebon, 4 F.3d 1, 2 (1st Cir.1993) ("[T]he fact that a witness contradicts herself or changes her story does not establish perjury."); United States v. Doherty, 867 F.2d 47, 70 (1st Cir.1989) (finding no decision that "prohibits a prosecutor from calling witnesses who will present conflicting stories"); United States v. Hemmer, 729 F.2d 10, 17 (1st Cir.1984) ("Simply because there exist[s] inconsistencies between [a witness's] grand jury and trial testimony does not warrant the inference that the government knowingly introduced perjurious testimony."). Absent evidence of "prosecutorial misconduct that actually biases the grand jury in performing its fact-finding function," United States v. Maceo, 873 F.2d 1, 3 (1st Cir.1989), we can go no further.[13] An indictment returned by a legally constituted and unbiased grand jury "is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence." United States v. Calandra, 414 U.S. 338, 363, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). For the same reason, we will not inquire into Casas's claim that there was insufficient evidence before the grand jury of his participation in the overt acts listed in the indictment. A grand jury proceeding is not a trial; only after conviction following a trial is sufficiency of the evidence an appropriate issue. See, e.g., Reyes-Echevarría, 345 F.3d at 5.
 
 3. Prosecutorial misconduct
 
 41
 All six appellants claim that the proceedings below were infected with prosecutorial misconduct to such an extent that they were denied a fair trial. In determining "whether prosecutorial misconduct has so poisoned the well that a new trial is required," we weigh several factors: "(1) the severity of the misconduct; (2) the context in which it occurred; (3) whether the judge gave any curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendant." United States v. Manning, 23 F.3d 570, 574 (1st Cir.1994). Taking a "balanced view of the evidence in the record," United States v. Rodríguez-De Jesús, 202 F.3d 482, 485 (1st Cir.2000), we evaluate the Manning factors to determine whether the misconduct likely affected the trial's outcome. See Manning, 23 F.3d at 574. We have noted, however, that "[t]he remedy of a new trial is rarely used; it is warranted only where there would be a miscarriage of justice or where the evidence preponderates heavily against the verdict." Rodríguez-De Jesús, 202 F.3d at 486 (internal quotation marks omitted).
 
 
 42
 The district court denied a number of motions during and after trial for a mistrial, a new trial, and dismissal of the indictment on grounds of prosecutorial misconduct. (TT 8/24/99: 22-23, TT 9/30/99: 51, Docket No. 1671 (denied at Docket No. 1723); Docket No. 1910 (denied at Docket No. 1948); Docket No. 1911 (denied at Docket No. 2049); Docket No. 1912 (denied at Docket No. 2049); Docket No. 1951 (denied at Docket No. 2049); Docket No. 2272 (denied at Docket No. 2315)). Although we determine the legal question of whether the prosecutor's actions constitute misconduct de novo, our review of whether the alleged misconduct requires a new trial is for abuse of discretion. United States v. Lewis, 40 F.3d 1325, 1337-38 (1st Cir.1994); United States v. Glantz, 810 F.2d 316, 320 n. 2 (1st Cir.1987); see also United States v. Mooney, 315 F.3d 54, 59 (1st Cir.2002) (motion for mistrial); Rodríguez De-Jesús, 202 F.3d at 485 (motion for new trial); United States v. Laboy, 909 F.2d 581, 585 (1st Cir.1990) (motion to dismiss indictment). Six alleged instances of prosecutorial misconduct are outlined below.[14] Although some of the tactics employed by the prosecutor's office in its zeal to convict crossed the line of acceptable prosecutorial conduct, we conclude that none of the alleged actions likely affected the outcome of the trial. Accordingly, no new trial is warranted.
 
 
 43
 a. Deception of Court
 
 
 44
 Appellants all complain that the circumstances surrounding the sentencing of Pérez and Martínez resulted from an abuse of prosecutorial discretion insofar as prosecutors allegedly misled the probation department and sentencing courts[15] about the Pérez's and Martínez's relevant conduct in order to secure their cooperation as witnesses against appellants.
 
 
 45
 Pérez was indicted, along with the three individuals arrested for the March 21, 1994 attempt to smuggle cocaine through the Carolina airport, on a single charge of aiding and abetting in the possession with intent to distribute eighty-one kilograms of cocaine. After being captured as a fugitive in October 1994, Pérez chose to cooperate with prosecutors. On December 14, 1994, he entered into a plea agreement with the government, under which he received immunity in the District of Puerto Rico for "any other crimes committed (except crimes of violence such as, but not limited to, murder) about which [Pérez] has informed the United States." The government agreed to recommend a Guidelines sentence with a base offense level ("BOL") of 32,[16] a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1, and a two-level reduction for having a minor role in the offense under U.S.S.G. § 3B1.2. The record reflects that by the time of Pérez's sentencing on September 8, 1995, the prosecutor was aware that Pérez's role in the larger conspiracy was far from minor, and that he had been involved in the murders of Blanco and de Jesús. Nonetheless, the prosecutor failed to bring information about the full extent of Pérez's relevant criminal conduct to the attention of the probation department or sentencing judge, failed to inform the probation department or judge that financial and other information provided by Pérez for the pre-sentence report was inaccurate, and failed to object to the pre-sentence report's recommendations of guidelines reductions for acceptance of responsibility and minor role.[17] Accordingly, the sentencing judge accepted the plea recommendations, departing, on the government's motion, even farther below the Guidelines range for substantial assistance under U.S.S.G. § 5K1.1.[18] The resulting sentence was for sixty months' imprisonment.
 
 
 46
 Martínez was indicted along with appellants and eventually agreed to plead guilty to Count Four (aiding and abetting in the possession with intent to distribute thirty-six kilograms of cocaine). The government agreed to a sentence based on 4.9 kilograms of cocaine, with a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1 and an additional two-level reduction if the "safety valve" provisions of 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2 were found to apply. Among other things, the "safety valve" requires that "the defendant did not use violence or credible threats of violence . . . in connection with the offense; [and] the offense did not result in death or serious bodily injury to any person." 18 U.S.C. § 3553(f)(2)-(3). Although AUSA Miguel Fernández had been present at Martínez's grand jury testimony concerning his participation in the Blanco and de Jesús murders (Appendix: 168, 172-79), the government's motion requesting downward departure represented that Martínez did qualify for the "safety valve." (Appendix: 83). The government did not inform the sentencing judge[19] — who also presided at appellants' trial — of the extent of Martínez's participation in the drug trafficking conspiracy, nor of his participation in the Blanco and de Jesús murders. (TT 9/30/99: 48). On February 26, 1998, Martínez was sentenced to twenty-four months' imprisonment.
 
 
 47
 It appears that the prosecutors misled the probation department and that sentencing courts as to the sentences of Pérez and Martínez. Prosecutors have a duty of candor to the court. See ABA Model Rules of Prof'l Conduct R. 3.3 (2002). That does not mean that these defendants/appellants have any right to complain about what happened with other defendants. But even if we assume that the Manning factors can be used when the purported misconduct is not directed against appellants themselves, the context in which it occurs — the sentencing of cooperating defendants — renders it unlikely to have affected the outcome of appellants' trial.[20] Further, while the courts that sentenced Pérez and Martínez may not have been aware of the full extent of their involvement in the drug conspiracy, the nature of both witness' activities within the organization, including their involvement in the murders, came out in their testimony on direct and cross-examination.[21] The evidence that they received lenient sentences in exchange for their cooperation with the government was exploited by the defense for its impeachment value. (TT 6/7/99: 23-36; TT 9/24/99: 12-16, 73-104). The jury was also presented evidence indicating that these sentences resulted from the government's failure to present all relevant evidence to the probation department and sentencing judges, in the form of testimony from the probation officers involved in preparing Pérez's and Martínez's pre-sentence reports and the federal prosecutor who handled Pérez's plea agreement and sentencing. Pérez was also cross-examined with regard to his PSR and admitted that he lied to the probation officer who prepared it. (TT 6/15/99: 79). Thus, we cannot conclude that the government's misconduct in securing low sentences for its cooperating witnesses likely affected the outcome of appellants' trial to their detriment.
 
 
 48
 b. Failure to disclose immunity agreements
 
 
 49
 Appellants next argue that the government improperly withheld information about cooperation agreements it granted to cooperating witnesses. The government responds that no such agreements were withheld and that defendants suffered no prejudice insofar as the details of all cooperation agreements were available for use during cross-examination of the cooperating witnesses.
 
 
 50
 During arguments outside the presence of the jury about whether the Blanco and de Jesús murders were part of the charged conspiracy, defense counsel inquired as to whether Pérez had been given immunity for his participation in the murders. (TT 5/26/99: 67). Quoting from Pérez's plea agreement, which granted immunity in the District of Puerto Rico "except for crimes of violence such as but not limited to murder," the government argued that Pérez did not have immunity. (TT 5/26/99: 75-76). The district court ordered Pérez and Martínez to appear in court, with representation, in order to be advised of their exposure to prosecution and right not to testify to the murders. (TT 5/28/99: 3). Prior to this appearance, the prosecutor indicated to Pérez's legal representative that his office did not intend to charge Pérez with the murders, on account of an internal policy against indictments based on uncorroborated witness statements. (TT 5/28/99: 23-28). Shortly thereafter, supplemental cooperation agreements granting immunity from prosecution in Puerto Rico, and the federal District of Puerto Rico, the Southern District of Florida, and the Southern District of New York for the two murders were negotiated with both Pérez and Martínez. (Appendix: 107). Both supplemental agreements were presented in court and provided to the defense.[22] (TT 6/3/99: 4-5; TT 9/21/99: 9-10).
 
 
 51
 During cross-examination on June 7, 1999, however, Pérez stated that he began providing the government information about the murders prior to the written immunity agreement because Agent Stoothoff had verbally informed him that he would not be prosecuted for the murders. (TT 6/7/99: 30-33). No such verbal immunity agreement was brought to the attention of the defense prior to trial. When he was recalled as a defense witness, Agent Stoothoff denied having made such a promise. (TT 10/28/99: 18).
 
 
 52
 About two months after Pérez testified, another former member of the drug trafficking organization, Martínez-Medina, was called as a government witness. The following exchange occurred at the beginning of his testimony:
 
 
 53
 Q. Okay. Did you enter your guilty plea by way of a common plea agreement or a cooperation plea agreement?
 
 
 54
 A. There was no agreement.
 
 
 55
 . . .
 
 
 56
 THE COURT: Didn't he say there was no plea agreement?
 
 
 57
 [PROSECUTOR]: No cooperation and plea agreement but just a plea agreement, a regular plea agreement.
 
 
 58
 (TT 8/19/99: 50-51). On cross examination, however, Martínez-Medina testified that, while he had no written cooperation agreement, he had a verbal agreement with AUSA Mercado wherein he understood that the government would consider filing for a reduction of his sentence in exchange for his testimony. (TT 8/24/99: 52-53). The prosecutor acknowledged that a motion had been filed, and granted, for an extension of the time based on an intent to request a sentence reduction in Martínez-Medina's case. (TT 8/24/99: 62; TT 8/25/99: 9). The defense moved for a mistrial on the basis that it could not be known whether other witnesses who had already testified also had undisclosed verbal cooperation agreements. (TT 8/24/99: 66).
 
 
 59
 Chastising the prosecutors for their failure to formalize such agreements in writing and to disclose them to the defense, the district judge denied the motion, finding that defendants' rights could be fully redressed by having the prosecutors file representations with regard to each witness who had already testified concerning the existence of any unwritten cooperation agreements, and by reopening cross-examination to the defense on any such agreements. (TT 8/24/99: 69-72). The court instructed prosecutors to confer with other AUSAs who had worked on the case to ensure that no cooperation agreements were overlooked, and to disclose any such agreements not only for past witnesses, but also for upcoming witnesses.[23] (TT 8/24/99: 69-72). The court instructed the jury, at the defense's request and using its proposed language, that "the prosecution had the duty to reveal the existence of [Martínez-Medina's cooperation] agreement and failed to do so. For that reason, the Court shall reopen the cross examination of this witness... solely to allow the defendants to examine him on that particular aspect." (TT 8/25/99: 13).
 
 
 60
 No disclosure of any unwritten cooperation agreement was made with regard to Martínez. However, when he testified in September 1999, he at first stated that he did have a verbal agreement with the government, prior to the written immunity created during trial, that he would not be prosecuted for the Blanco and de Jesús murders. (TT 9/24/99: 76-82). When questioned later, however, he stated that he did not have such an agreement and did not know why he had testified otherwise before. (TT 9/27/99: 36). The court denied another motion for mistrial, which was based in part upon the prosecution's failure to disclose the verbal cooperation agreements, on September 30, 1999. (TT 9/30/99: 12, 37, 51).
 
 
 61
 Suppression of evidence favorable to the defense violates due process. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Brady rule applies to evidence affecting key witnesses' credibility, Giglio v. United States, 405 U.S. 150, 153-54, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and thus would encompass the verbal cooperation agreements discussed above. While we note that Agent Stoothoff denied having promised that Pérez would not be prosecuted for the murders, knowledge of any such promise, if it existed, would be imputed to the prosecution, along with knowledge of the promise made by AUSA Mercado to Martínez-Medina to consider a sentence reduction if he testified against appellants. See id. at 154; Kyles v. Whitley, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). However,
 
 
 62
 "[w]hen the [Brady/Giglio] issue is one of delayed disclosure rather than of nondisclosure, ... the test is whether defendant's counsel was prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case" ... [and][w]e review the district court's decision on how to handle delayed disclosure of Brady material for abuse of discretion.
 
 
 63
 United States v. Catano, 65 F.3d 219, 227 (1st Cir.1995) (quoting United States v. Ingraldi, 793 F.2d 408, 411-12 (1st Cir.1986)).
 
 
 64
 Here, the defense was not prejudiced in its ability to use the existence — or, at any rate, the three cooperating witnesses' belief in the existence — of verbal cooperation agreements to call the cooperating witnesses' credibility into question. While the government denies having made any such agreements with Pérez and Martínez, it is clear that the government indicated to Martínez-Medina that a reward for cooperation would be considered. Accordingly, the representation during direct examination that no cooperation agreement existed was, at best, misleading, and we strongly condemn the prosecution's failure to correct the statement or to disclose the existence of a cooperation agreement as required by Giglio. However, for each witness, the existence, confirmed or otherwise, of the verbal cooperation agreement came out during cross-examination and was sufficiently investigated by the defense. See United States v. McGovern, 499 F.2d 1140, 1143 (1st Cir.1974) (finding no prejudice from late disclosure of cooperation agreement because it occurred while witness was still on the stand and court allowed further cross-examination). No prejudice resulted to defendants.
 
 
 65
 Although the misconduct, at least with respect to the Martínez-Medina agreement, was serious, we find that it was unlikely to have affected the outcome of trial when considered in light of the opportunity for cross-examination and the curative actions taken by the court. We thus find no abuse of discretion in the district court's denial of a mistrial on the basis of the late disclosure of these agreements.[24]
 
 
 66
 c. Violation of sequestration orders
 
 
 67
 Nicolai, Correy, and Pizarro argue that the government engaged in misconduct by violating witness sequestration orders. On May 26, 1999, Pérez was testifying but had not yet testified about the Blanco and de Jesús murders. (TT 6/2/99: 82). Pending before the court at that time was the issue of whether the murders were a part of the charged conspiracy. While carrying out his duties to escort Pérez to and from court, Agent Stoothoff discussed with him factual issues relevant to the potential connection. (TT 6/2/99: 83-84). The defense argued that this conversation violated the court's order that Pérez not discuss his testimony with anyone else[25] and sought to prohibit Pérez from later testifying about the murders. Upon reviewing notes taken by the prosecutor during a November 1995 interview in which Pérez gave the same information that he later discussed with Agent Stoothoff, the district court determined that the sequestration order had been violated but that no prejudice resulted because the conversation did not alter Pérez's testimony. (Docket No. 1294). The order also admonished that any future contact between the government and testifying witnesses concerning matters about which they would testify would result in the exclusion of such testimony. (Docket No. 1294). Appellants have not indicated that additional violations occurred. We find no abuse of discretion in the district court's determination that defendants suffered no prejudice as a result of the violation of its somewhat ambiguous sequestration order.[26]
 
 
 68
 d. Offering false testimony
 
 
 69
 Nicolai, Pizarro, and Correy assert that the government presented testimony at trial that it knew or should have known was false.[27] Nicolai's and Pizarro's claims are readily disposed of, as they are based on the government's presentation of Pérez's and Martínez's conflicting accounts of the Blanco and de Jesús murders.[28] The government violates due process when it obtains a conviction by soliciting or failing to correct false evidence. Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). However, "[n]either Napue nor any other decision prohibits a prosecutor from calling witnesses who will present conflicting stories." United States v. Doherty, 867 F.2d 47, 70 (1st Cir.1989). As the district court correctly recognized, such conflicts are a matter to be explored on cross-examination (Docket No. 1276: 7), and the credibility of each account is for the jury to determine. In addition, we find that appellants were not prejudiced by the conflicting testimony, which differed in its description of Pérez's, not the charged defendants', actions during the murders. The defendants charged with the murders were acquitted, demonstrating that the contradictory testimony likely undermined the credibility of both key prosecution witnesses.
 
 
 70
 Correy also raises a number of inconsistencies that fall far short of showing that the witnesses in question perjured themselves, much less that the government knowingly allowed them to do so. First, Correy refers to Martínez-Medina's testimony that misleadingly implied he had received no consideration for his cooperation with prosecutors. We have already addressed this issue above. See supra at 35-38. Correy also cites Agent Stoothoff's assertion, during his direct testimony as a defense witness, that he saw an American Airlines flight manifest that indicated that Correy and others flew to Puerto Rico immediately prior to the Blanco and de Jesús murders. (TT 10/28/99: 64-67). The government, however, was no longer in possession of the manifest, and Correy asserts that the manifest would have been destroyed according to the airline's document retention procedures long before Agent Stoothoff claims he obtained it. Correy has not shown that Stoothoff lied about seeing the manifest, however, and even if he had, the testimony was stricken and the jury was instructed to disregard it as violative of Federal Rule of Evidence 1003. (TT 10/28/99: 131-32, 136).
 
 
 71
 Correy alleges two other instances of perjury or prosecutorial misconduct. The first is Agent Stoothoff's incorrect assertion that another investigator, who later testified to the contrary (TT 11/23/99: 31), told him a dive team had searched for evidence of the Blanco and de Jesús murders. The second is cooperating witness Vélez's testimony that Correy participated in a drug transaction despite his failure, when debriefed by investigators, to mention Correy's participation and Martínez's conflicting testimony that Correy was not present for that particular transaction. Neither instance demonstrates perjury or prosecutorial misconduct.
 
 
 72
 [T]he government is not forbidden to call witnesses whose reliability in one or many particulars is imperfect or even suspect. Its obligations are to make a clean breast of any evidence it has which may contradict such witnesses or undermine their credibility, and not to rest its case upon testimony which it believes to be incorrect.
 
 
 73
 McGovern, 499 F.2d at 1143; See generally Lebon, 4 F.3d at 2 ("[T]he fact that a witness contradicts herself or changes her story does not establish perjury."); Doherty, 867 F.2d at 70 (finding no decision that "prohibits a prosecutor from calling witnesses who will present conflicting stories").
 
 
 74
 e. Preservation of evidence
 
 
 75
 Bonilla argues that he was prejudiced by the government's[29] failure to preserve evidence — bullet casings and a bloody shirt — taken from the scene of the Blanco and de Jesús murders. Bonilla was not charged in the murder counts, but argues that the evidence might have helped to impeach the credibility of Pérez by showing that Martínez's account of the murders was true and Pérez had lied about his involvement. Bonilla's position relies on the speculative reasoning that the bullet casings might have been traceable to Pérez's weapon, or that Pérez's DNA might have been found on the shirt, thereby demonstrating that Pérez lied about not shooting the victims. Neither of these outcomes appears likely from Martínez's account, which was that Correy and Nicolai used weapons provided by Pizarro to shoot the victims inside a rental car and then Nicolai used a t-shirt to wipe fingerprints from the interior. (TT 9/21/99: 85-95). Moreover, Pérez's credibility had already been called into serious question by the discrepancy between his and Martínez's accounts of the murders. Accordingly, we find that Bonilla was not prejudiced by the apparently inadvertent loss of the casings and shirt.
 
 
 76
 Bonilla also claims prejudice from the government's failure to maintain an electronic organizer in operating condition, resulting in the admission instead of an investigator's partial transcription of its contents. The claim is without merit. The organizer was nonfunctional because its batteries were dead, and rather than risk losing data by changing the batteries, investigators transcribed its contents before it lost power. The district court considered and overruled objections to admitting the transcribed information, holding that there was no evidence of intentional tampering and that the incomplete record of the contents was a topic appropriate for cross-examination. (TT 5/21/99: 67). We find no abuse of discretion in the ruling, nor prosecutorial misconduct in the use of the transcription.
 
 
 77
 f. Inappropriate gestures
 
 
 78
 Correy claims that the prosecution attempted to influence witnesses and the jury by making inappropriate gestures in open court. Correy points to three instances in particular. On June 14, the prosecution objected to Nicolai's (who was conducting a cross-examination pro se) allegedly turning and making a face at the prosecution table when he received a favorable ruling. In the resulting sidebar, Nicolai and others on the defense alleged that the prosecutors had also been gesturing, nodding or otherwise showing satisfaction with favorable testimony and attempting, through rapid-fire objections, to throw Nicolai off. The court admonished all parties to behave. (TT 6/14/99: 23-29). On September 1, the defense objected that a law enforcement officer seated at the prosecution table was blatantly "coaching" Pérez as he testified, through gestures. The trial judge witnessed some of these gestures, and, though she did not conclude whether they were voluntary or inadvertent, admonished the officer to stop making any gestures that could be interpreted by the witness as direction. (TT 9/1/99: 65-73). During the sidebar discussion of this incident, Nicolai and others on the defense again suggested that AUSA Fernández was attempting to throw Nicolai off by, for example, tapping his pen loudly. The court once again admonished all counsel to behave appropriately. (TT 9/1/99: 65-73). Finally, on October 26, the defense raised concerns that the behavior of the prosecutor demonstrated a lack of respect for the court's authority and might lead the jury to conclude that the government attorneys enjoyed more latitude than defense counsel. The judge was aware of two such instances, one in which she had to admonish the prosecutor to abide by an evidentiary ruling, and another in which the prosecutor threw his pen after receiving an adverse ruling. She admonished him to keep his behavior in check and to respect the court's authority. (TT 10/26/99: 175-77).
 
 
 79
 The trial judge was in a far better position than we to determine whether the alleged gestures and other behavior occurred, whether they appeared to be intentional or inadvertent, and whether they had any influence on witnesses or the jury. We will not second-guess her rulings on the record before us. With regard to those gestures that the court did observe — nodding at the witnesses, disregarding a ruling, and throwing a pen — whether they were intentional or not, they were unprofessional and inappropriate. However, they occurred in the context of a seven-month jury trial, were addressed by admonishments from the court, and, from the record, do not appear to have prejudiced Correy or the other defendants. Within the overall framework of this lengthy trial, they were unlikely to have affected the outcome of trial. Thus, they fall short of rendering the trial so unfair as to require a new one.
 
 
 80
 In sum, we find that none of the alleged instances of prosecutorial misconduct was likely to have affected the outcome of the trial, and thus none requires a new trial. To be sure, "[i]ndividual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect." United States v. Sepúlveda, 15 F.3d 1161, 1195-96 (1st Cir.1993). The prosecution's initial failure to disclose the unwritten cooperation agreement it created with Martínez-Medina, along with the less disconcerting but still inappropriate violation of Pérez's sequestration order and the government's courtroom behavior all reflect poorly on the conduct of the prosecution. However, when viewed "against the background of the case as a whole," id. at 1196 — a seven-month trial of ten defendants on charges stemming from a large and lengthy drug-trafficking conspiracy, during which the trial judge diligently addressed and effectively corrected for errors as they were brought to her attention — the fairness of the trial was not compromised.
 
 
 81
 Finally, we note that although "[w]hen confronted with extreme misconduct and prejudice" we may "invoke [our] supervisory powers to remedy the violation of a recognized right, preserve judicial integrity, and deter illegal conduct" by ordering a new trial, we cannot do so "[w]ithout a nexus between improper prosecutorial practice and prejudice to the defendant." United States v. Osorio, 929 F.2d 753, 763 (1st Cir.1991); see also Bank of Nova Scotia v. United States, 487 U.S. 250, 254-55, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988). We cannot therefore consider action to penalize the tactics employed in this case because appellants were not prejudiced by the prosecutor's actions.
 
 4. Juror misconduct
 
 82
 During a trial recess, a court officer heard one of the jurors say that she was jealous and heard another juror explain that it was because Nicolai's wife was in the courtroom.[30] The trial judge decided, over the objection of appellants, to further investigate the matter by interviewing the juror in question. Although the juror initially denied the comment, she eventually made a number of assertions that raised concerns about jury bias, including that some female jurors "liked" certain defendants, that she knew Nicolai was in jail, and that jurors had expressed the opinion that Nicolai was a "cabesilla [sic]"[31] (kingpin) of a gang. Her responses also suggested that the jurors might prematurely have begun deliberating about the trial by discussing the evidence presented and whether certain defendants should be convicted.
 
 
 83
 Following the interview, several defendants moved for a mistrial. The court denied that motion, opting instead to voir dire each member of the jury individually to determine whether any of them had formed an opinion or was improperly affected by the statements of the first juror. Based on the voir dire, the court excused the first juror along with another juror who indicated that she had already made a decision about three of the defendants. The court also denied defendants' renewed motion for a mistrial and to strike additional jurors. Appellants Nicolai and Pizarro argue that the court erred in declining to declare a mistrial or to strike other jurors, largely because a number of jurors allegedly displayed a "lack of candor" when questioned and one juror demonstrated a lack of English proficiency.
 
 
 84
 "When a non-frivolous suggestion is made that a jury may be biased or tainted by some incident, the district court must undertake an adequate inquiry to determine whether the alleged incident occurred and if so, whether it was prejudicial."[32] United States v. Gastón-Brito, 64 F.3d 11, 12 (1st Cir.1995) (internal quotation marks omitted). "[T]he district court maintains significant discretion in determining the type of investigation required by a juror misconduct claim," which "is at its broadest when determining how to deal with an allegation of premature jury deliberations." United States v. Mikutowicz, 365 F.3d 65, 74 (1st Cir.2004). We review the district court's actions for abuse of that discretion. Id.
 
 
 85
 After lengthy interviews with each juror, during which the prosecution and defense counsel were also permitted to ask questions, the trial judge stated that "the Court finds, and I am convinced, that the fairness of the trial is not in jeopardy,... [and that o]n the matter of lack of candor of the jurors, I did not perceive that from any of the jurors who came before us." (TT 8/20/99: 138). The two jurors whom the trial judge deemed to be biased were dismissed, and the remaining jurors were instructed again that they were not to draw conclusions about the facts of the case until the trial ended. (TT 8/23/99: 5-6). Having reviewed the voir dire transcript, we can find no abuse of discretion in the corrective measures adopted by the district court. Nor did the court abuse its discretion in refusing to instruct each juror not to discuss his or her interviews with the rest of the jury.[33]
 
 
 86
 Appellants also argue that one of the jurors ought to have been discharged because she demonstrated a lack of reasonable English proficiency. The juror was questioned and gave responses in English both at jury selection and when interviewed about potential jury misconduct on August 20, 1999. On both occasions, defense counsel was present, but no objection was made. Under such circumstances, our cases require a showing of "`manifest' or `clear' injustice." United States v. Nickens, 955 F.2d 112, 117 (1st Cir.1992) (quoting United States v. Cepeda Penes, 577 F.2d 754, 759 (1st Cir.1978)); Thornburg v. United States, 574 F.2d 33, 36 n. 5 (1st Cir.1978). Here, the Nickens case is controlling, since we determined that:
 
 
 87
 where the juror[], individually, [was] required to speak some English in the presence of defendant and counsel at the voir dire, where counsel thereafter raised no objection and sought no further inquiry, and where the record itself does not compel the conclusion that the juror[][was] necessarily incompetent, there was no clear or manifest injustice in [her] service.
 
 
 88
 Nickens, 955 F.2d at 118. Indeed, in the instant case, appellants had two opportunities to evaluate the juror's English and to request additional inquiry into her proficiency, but "[t]he opportunity to make ... further evaluation was irretrievably lost by the failure to object." Id. at 117. None of the circumstances offered by appellants — that the juror indicated that her English was "not good," and that she twice requested clarification of a question about whether the jury had an open mind about the case[34] — compel the conclusion that she was incompetent. Accordingly, appellants have not made the requisite showing for relief.
 
 5. Evidentiary arguments
 
 89
 a. Evidence of killings
 
 
 90
 Counts Five and Six of the superceding indictment charged Correy and Nicolai with killing Blanco and de Jesús while engaged in an offense punishable under 21 U.S.C. §§ 841(b)(1)(A), 846 (the drug trafficking conspiracy charged in Count One), in violation of 21 U.S.C. § 848(e). Accordingly, evidence concerning the killings was offered at trial. Appellants Flores and Bonilla argue that the killings in question were not related to the drug trafficking conspiracy charged in Count One, but rather resulted from a separate conspiracy between Correy, Nicolai, and others. Accordingly, they argue, the trial court erred in admitting evidence about the killings. Although neither Flores nor Bonilla was charged in Counts Five or Six, they claim they were prejudiced by the spillover effects of that evidence.
 
 
 91
 During the direct examination of Pérez, counsel for Bonilla sought to exclude evidence of the killings on the basis that they were not part of the charged conspiracy. (TT 5/26/99: 17-18). After extensive argument (TT 5/26/99: 47-77) and in camera review of portions of Pérez's and Martínez's grand jury testimony, the district court issued an order overruling the objection. (Docket No. 1276). The court found that the killings were sufficiently related to the conspiracy charged in Count One, in part because of Martínez's testimony that Pérez wanted the killings to occur because he suspected Blanco of stealing drugs in transit. (Docket No. 1276). We can find no abuse of discretion in that determination. See United States v. Mercado Irizarry, 404 F.3d 497, 500 (1st Cir.2005) (evidentiary rulings reviewed for abuse of discretion).
 
 
 92
 Moreover, appellants have failed to show prejudice from the spillover effects of the testimony in question. The court took adequate measures to guard against spillover prejudice by instructing the jury to consider each charged offense, and any evidence relating to it, separately as to each defendant. (TT 12/13/99: 118). United States v. Bailey, 405 F.3d 102, 112 (1st Cir.2005); United States v. Houle, 237 F.3d 71, 76 (1st Cir.2001). "We presume that jurors follow such instructions," and the fact that defendants were acquitted on Counts Four, Five and Six "is strong evidence that the jury successfully compartmentalized the evidence and applied the appropriate evidence to the appropriate counts and defendants." Bailey, 405 F.3d at 112. Moreover, Correy's and Nicolai's acquittal on the murder charges suggests that evidence of the killings was not credited or applied against those directly charged in Counts Five and Six. It would be difficult, therefore, to imagine how the same evidence could have prejudiced appellants with respect to Count One. Accordingly, Flores' and Bonilla's appeal on this evidentiary claim fails.
 
 
 93
 b. Overview testimony
 
 
 94
 Flores argues, based on our holding in the appeal of four defendants who were tried separately on the same indictment, United States v. Casas, 356 F.3d 104, 117-24 (1st Cir.2004), that the trial court erred in admitting improper preliminary "overview" testimony from Agent Stoothoff. In Casas, we made clear that the practice of having a government agent testify broadly to summarize facts not yet (or, as in Casas, never to be) in evidence in an effort to "paint a picture of guilt before the evidence has been introduced," id. at 119 (quoting United States v. Griffin, 324 F.3d 330, 349 (5th Cir.2003)), is "inherently problematic," id.
 
 
 95
 Three points at which Agent Stoothoff testified about the existence and operation of a drug smuggling organization involving the defendants are cause for concern. First, in describing his investigation immediately after the airport arrests, Agent Stoothoff reported that he "tried to identify other co-conspirators that had anything to do with the 81 kilograms of cocaine ... [and] tried to substantiate what our cooperator at the time ... had told us about previous trips which he had made for the organization carrying cocaine." (TT 5/18/99: 71). This response assumes the existence of a drug conspiracy or organization about which no facts had yet been offered into evidence. No objection, however, was made by the defense. More disconcerting is Agent Stoothoff's later description of the operations of the alleged organization, in response to a general question about the results of his investigation:
 
 
 96
 A. Our investigation revealed that this organization had —
 
 
 97
 MR. MASINI: Objection.
 
 
 98
 MS. TREVIÑO: "The organization."
 
 
 99
 THE WITNESS: Our investigation revealed that this group of people that we identified had previously moved cocaine through the airport in Carolina, Puerto Rico, and continued to move cocaine through Puerto Rico and other entry points such as Miami, up to New York, after —
 
 
 100
 Objections from two defense attorneys to lack of foundation followed, but were overruled. That ruling was erroneous, as it does not appear from the record that Agent Stoothoff had personal knowledge of the group's activities outside of the incident at the Carolina airport on March 21, 1994.
 
 
 101
 Later during the direct examination, Agent Stoothoff discussed the information he obtained from Pérez about the operations of the drug conspiracy. At first, his testimony was limited to a description of what Pérez told him, but he soon began to directly state the information apparently provided by Pérez, as a matter of fact:
 
 
 102
 THE WITNESS: [Pérez] advised us what the jobs of the actual participants and the co-conspirators were in his organization. He provided us with general dates of loads of cocaine which were transported from Puerto Rico or Dominican Republic to New York, sometimes via Miami.
 
 
 103
 Q: How large were you able to determine the drug trafficking organization was [sic]?
 
 
 104
 A: The drug trafficking organization encompassed in excess of 60 people.
 
 
 105
 Q: What were you able to determine about the roles of in excess of 60 people that were identified to you?
 
 
 106
 (TT 5/18/99: 80-81). After an objection from the defense to lack of foundation was overruled, Agent Stoothoff proceeded to describe the activities — such as accompanying drug shipments and laundering proceeds from the sale of drugs — of various individuals whom he stated he had identified, although he did not provide their names. This line of testimony appears to have been based, at least in part, on information provided by Pérez. Cf. Casas, 356 F.3d at 118.
 
 
 107
 Here, as in the earlier severed trial, Agent Stoothoff "went well beyond his personal knowledge based on the airport incident and the search," and "did not differentiate the testimony that was based on personal knowledge from other sources of information." Id. at 118-19. Although he did not this time go so far as to "essentially testif[y] that each of the defendants was guilty of the conspiracy charged," id. at 119, the comments described above are nonetheless improper. The admission of this testimony, however, is harmless as to Flores if the government can show that "it is highly probable that the error did not influence the verdict." Id. at 121.
 
 
 108
 Flores was convicted on the only count for which he was charged — Count 1, which alleged conspiracy to possess with intent to distribute heroin and cocaine. In particular, Flores was accused of receiving thirty kilograms of cocaine at the Luis Muñoz Marín International Airport in Carolina, Puerto Rico, and smuggling them past security. Three cooperating witnesses — Pérez, Vélez, and Martínez-Medina — testified that an individual named "Ratón," who worked as a janitor at the airport, would receive carry-on bags containing cocaine at a bar on the unsecured side of the terminal and carry them past security, delivering them to members of the organization at a restaurant on the secure side of the terminal.[35] Two of these witnesses, Pérez and Martínez-Medina, identified Flores by sight as Ratón (TT 5/25/99: 29-30; TT 8/19/99: 77-78), and Martínez-Medina recalled that Ratón's real name was Raymond or Ramón (TT 8/19/99: 78).
 
 
 109
 Although, as Flores points out, the trial testimony about Ratón's appearance was not entirely consistent,[36] Agent Stoothoff never identified Flores by name or appearance, and so any improper testimony he gave could not have increased the jury's likelihood of concluding that Flores was, indeed, the person described as Ratón. Although Agent Stoothoff did impermissibly describe the existence of a conspiracy, there was more than ample evidence of the same fact from other sources for the jury to convict. Accordingly, no prejudice resulted from the court's improper admission of Agent Stoothoff's overview testimony.
 
 6. Court Reporter Act
 
 110
 Bonilla argues that the district court erred in allowing the court reporter to read back requested portions of trial testimony in the jury room, without recording the read back. We need not consider the issue, however, because the trial record reflects that no such read back actually occurred, the jury having determined that it did not wish to hear the requested testimony after all. (TT 12/14/99: 14).
 
 7. Newly discovered evidence
 
 111
 Pizarro and Nicolai argue that the district court erred in denying Nicolai's motion[37] for a new trial on the basis of newly discovered evidence that Pérez continued to be involved in drug-trafficking activities during appellants' trial. (Docket Nos. 2272, 2315). On February 16, 2001, Pérez was indicted on drug conspiracy charges in the United States District Court for the Southern District of Florida. United States v. Bido, No. 01-139 (S.D.Fla. Feb. 16, 2001). The period of the charged conspiracy was from August 17, 1999 to February 2, 2001. Pérez's testimony in the instant case concluded in early July 1999. On May 13, 2002, Nicolai moved for a new trial in part on the basis of this newly discovered evidence, which, he argued, would have served to further impeach the credibility of Pérez's testimony. The motion also alleged prosecutorial misconduct for failure to notify the defense of Pérez's ongoing criminal activity and knowingly allowing Pérez to commit perjury while testifying in the instant case. In the alternative to a new trial, Nicolai sought additional discovery and an evidentiary hearing on the claims. (Docket No. 2272). The district court[38] denied the motion, a ruling which we review for abuse of discretion. United States v. Colón-Muñoz, 318 F.3d 348, 357-58 (1st Cir.2003) (motion for a new trial and evidentiary hearing).
 
 
 112
 To prevail on a motion for a new trial under Federal Rule of Criminal Procedure 33 on the basis of newly discovered evidence, the movant must show that "(1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to lack of diligence by the defendant; (3) the evidence is material, and not merely cumulative or impeaching; and (4) it will probably result in an acquittal upon retrial of defendant." Id. at 358 (internal quotation marks omitted). To satisfy the fourth prong, if the evidence has only recently come to the attention of defendant because of a Brady violation or the government's knowing use of perjured testimony, the defendant must show a "reasonable probability" or "reasonable likelihood" that its timely disclosure would have altered the trial result. United States v. González-González, 258 F.3d 16, 20-22 (1st Cir.2001). At issue is "whether defendants received a fair trial resulting in a verdict worthy of confidence." Id. at 22. In the absence of a Brady violation, or when perjured testimony has been used unwittingly, the defendant must meet the more onerous standard of showing an "`actual probability that an acquittal would have resulted if the evidence had been available.'" Id. at 20-21 (quoting Sepúlveda, 15 F.3d at 1220).
 
 
 113
 The district court held that the evidence in question was not material, insofar as (1) it dealt with activities that occurred after Pérez's testimony concluded, and thus would not have been useful for impeachment purposes, and (2) even if it could have been used to impeach Pérez's credibility, it would have been cumulative because Pérez's credibility was already dubious and he had admitted to extensive involvement in the criminal activities that formed the basis of the instant indictment. Moreover, the court held, even if the information satisfied the third prong for a Rule 33 motion, the fourth prong was not met because there was strong evidence, even in the absence of Pérez's testimony, of Nicolai's involvement in the conspiracy charged in Count 1, for which he was convicted.[39] We agree with these findings and find no abuse of discretion in the district court's denial of the motion for a new trial on the basis of Pérez's ongoing criminal activity. (Docket No. 2315).
 
 
 114
 The district court also found no evidence of prosecutorial misconduct, noting that the prosecution could not have improperly withheld evidence that it did not yet possess, and that there was no evidence it knowingly permitted Pérez to perjure himself by failing to admit to his ongoing criminal activities. The Florida indictment was not issued until after the conclusion of appellants' trial, and, despite the affidavit of an FBI agent in which Pérez's criminal activities as early as August 17, 1999 are discussed, it was not readily apparent that the government had information about these activities prior to the conclusion of the trial. (Docket No. 2315).
 
 
 115
 Absent another basis for the denial of a new trial for prosecutorial misconduct, we might agree with appellants that their motion for further discovery and an evidentiary hearing should have been granted in order to determine what, if anything, the government knew about Pérez's ongoing criminal activities during trial. However, the district court reviewed the applicable Manning factors and determined that even if prosecutorial misconduct had occurred via nondisclosure, it did not render the trial unfair because the remaining evidence against Nicolai was so strong that the jury's verdict would not have been altered. We agree and find that the evidence was similarly strong against Pizarro. (Docket No. 2315). Accordingly, the district court did not abuse its discretion when it denied additional discovery and an evidentiary hearing on the basis that Nicolai's claim was "conclusively refuted as to the alleged facts by the files and records of the case," United States v. Carbone, 880 F.2d 1500, 1502 (1st Cir.1989) (internal quotation marks omitted), because Nicolai had failed to show that the new evidence undermined the jury's verdict, given the ample evidence against him.
 
 B. Sentencing
 
 116
 On April 8, 2002, in response to a backlog of cases on Judge Cerezo's docket, the Judicial Council of the First Circuit entered an order directing a three-judge committee of the District of Puerto Rico to review long-pending criminal and civil cases and to remove those deemed, by a majority vote of that committee, to be likely to be expedited by reassignment. See Fed.R.Crim.P. 25(b) (permitting replacement of trial judge who becomes unable to perform duties after a guilty verdict); Colón-Muñoz, 318 F.3d at 354-55 (holding that inability due to substantial delay falls within Fed.R.Crim.P. 25(b)). On April 12, 2002, that committee ordered thirty-five cases, including the one now on appeal, randomly reassigned.[40] (attached to Docket No. 2250).
 
 
 117
 On April 24 and 25, 2002, the successor judge set sentencing for each appellant for early May. Nicolai, joined by the other appellants, moved to have the case reassigned to the trial judge for sentencing because of her familiarity with the case. (Docket Nos. 2211, 2219, 2220, 2222, 2225, 2227). Casas filed a separate motion requesting transfer, noting in particular that the trial judge had already made rulings affecting sentencing when she ordered the Probation Office to calculate the drug quantities attributable to each defendant on the basis of the trial evidence (Docket No. 1856) — a calculation that had not yet been added to his PSR — and when she ordered the compilation of evidence pertaining to the sentencing of Pérez and Martínez, for purposes of conducting an inquiry into the issue of prosecutorial misconduct. (Docket Nos. 1624, 2233). On May 7, 2002, the successor judge denied the motions to transfer the case back to the trial judge and stated that he had "familiarized himself with this case and [had] reviewed the transcripts and pleadings which pertain to these defendants." (Docket No. 2250).
 
 
 118
 Because the indictment had not assigned specific drug quantities to each defendant, nor had the jury issued special verdicts attributing drug quantities to the individual defendants, the district court made individual quantity determinations based on its review of the record. The district court relied heavily on the testimony of Martínez on September 21, 1999 in calculating the drug quantities attributable to each defendant.
 
 
 119
 Correy was found responsible for over 150 kilograms of cocaine, resulting in a base offense level ("BOL") of 38. The sentencing judge added a two-level enhancement for possession of a weapon under U.S.S.G. § 2D1.1, for a total offense level ("TOL") of 40, and on the basis of the TOL and a Criminal History Category ("CHC") of VI, sentenced Correy to 480 months imprisonment, out of a Guidelines range of 360 months to life. Casas, who had a CHC of I, was also found responsible for over 150 kilograms of cocaine, for a BOL of 38. He was sentenced to the bottom end of the 235 to 293 month Guidelines range. Bonilla also had a CHC of I and was found responsible for over 150 kilograms of cocaine. The court declined to add a weapons enhancement, sentencing Bonilla to the lower end of the Guidelines range at 235 months. Pizarro was held accountable for more than 150 kilograms of cocaine, along with a two-level enhancement for weapon possession and a three-level role enhancement, for a TOL of 43. Combined with a CHC of II, the Guidelines mandated a life sentence. Flores received a sentence based on a BOL of 38, representing 150 kilograms or more of cocaine, and a two-level enhancement for abuse of a position of trust. Combined with a CHC of I, the applicable Guidelines range was 292 to 365 months. Flores was sentenced to the bottom of that range, 292 months. Finally, Nicolai was found responsible for over 150 kilograms of cocaine, and received a two-level weapon enhancement and a four-level role enhancement, for a TOL of 43 combined with a CHC of IV. The Guidelines accordingly mandated a life sentence.
 
 
 120
 Appellants raised a number of objections to sentencing and now appeal on those bases before this court. We deal with the various objections in turn.
 
 1. Reassignment for sentencing
 
 121
 Flores, Pizarro, and Nicolai argue that the committee abused its discretion in reassigning this case, because the record was so voluminous that it would not be possible for the successor judge to adequately familiarize himself with the case.
 
 
 122
 Fed.R.Crim.P. 25(b)(2) permits a successor judge to order a new trial "if satisfied that ... a judge other then the one who presided at the trial cannot perform the post-trial duties." We have interpreted this clause to indicate that a new trial may be required if "a judge who inherits a case at the post-verdict stage [is] not ... sufficiently familiar with the case to sentence the defendants without conducting a new trial." United States v. Casas, 356 F.3d 104, 128 (1st Cir.2004); see also Colón-Muñoz, 318 F.3d at 356. Ordinarily, however, the successor judge is "`capable of assessing the credibility of the witnesses and the evidence at trial by a thorough review of the record.'" Colón-Muñoz, 318 F.3d at 355 (quoting United States v. Bourgeois, 950 F.2d 980, 988 (5th Cir.1992)). The trial record in this case is of daunting proportions, and we are all too aware that a thorough review is a time-consuming process, but it is not so insurmountable a task as to render the committee's decision to reassign the case an abuse of discretion. There was no error in the committee's reassignment of the instant case prior to sentencing.
 
 
 123
 2. Sentencing judge's familiarity with record
 
 
 124
 Appellants next argue that the sentencing judge abused his discretion in refusing to return the case to the trial judge and in proceeding with sentencing because he lacked sufficient familiarity with the record. As we noted above, a replacement judge is ordinarily "capable of assessing the credibility of the witnesses and the evidence at trial by a thorough review of the record." Id. Courts of Appeals "give great deference to the district judge's decision to proceed with sentencing." United States v. Larios, 640 F.2d 938, 942 (9th Cir.1981); see also United States v. McGuinness, 769 F.2d 695, 696 (11th Cir.1985) (stating that "[a] sentencing judge enjoys broad discretion to determine whether he can perform sentencing duties in a case he did not try").
 
 
 125
 In the instant case, approximately one-third of the trial days had not been transcribed at the time of sentencing and thus were unavailable to the sentencing judge for review. This absence of transcripts initially gives us pause, both because of the amount of unavailable transcripts and because credibility was an important issue in appellants' trial. However, after carefully reviewing the record, our concern is lessened due to several factors.
 
 
 126
 First, our review of the record reveals that, while most of the appellants requested transcripts at one time or another (Docket Nos. 1644, 1645, 1647, 1736, 2143), the transcripts that they requested were made available by the time of their sentencing.[41] Second, the original trial judge ordered only the transcripts that she felt were relevant for sentencing the appellants. (Docket No. 1715). These transcripts were available to the successor sentencing judge. Third, the sentencing judge repeatedly stated that he had reviewed the portions of the record pertinent to defendants' sentencing and cited to specific passages of the transcripts in determining the drug quantity attributable to each defendant.
 
 
 127
 The Ninth Circuit has stated that the scrutiny with which the record must be examined by a successor judge "varies with the facts of each case[;] the more the case depends on the credibility, and especially the demeanor, of the witnesses, the more a judge needs to do to become adequately familiar with it." Larios, 640 F.2d at 943. While we agree with Larios's proposition, we need not analyze the merits of appellants' complaints on this issue further because we are remanding their cases for re-sentencing — at which appellants and the sentencing judge will have access to all of the transcripts — due to Booker error and violations of Fed.R.Crim.P. 32(e). See infra.[42]
 
 
 128
 3. Federal Rule of Criminal Procedure 32(e)[43]
 
 
 129
 Under the Federal Rules of Criminal Procedure, "[t]he probation officer must give the presentence report to the defendant, the defendant's attorney, and an attorney for the government at least 35 days before sentencing unless the defendant waives this minimum period." Fed.R.Crim.P. 32(e)(2).[44] Bonilla argues that, pursuant to an order from Judge Cerezo, the Probation Office was required to prepare a revised PSR that contained findings regarding the quantities and types of drugs attributable to Bonilla. Bonilla never received a revised PSR prior to his sentencing hearing. Before addressing this argument, we pause to briefly provide background.
 
 
 130
 Bonilla, along with the other appellants, was convicted of Count I, conspiracy to possess with intent to distribute approximately 1400 grams of heroin and 9445 kilograms of cocaine. We have consistently held that
 
 
 131
 when a district court determines drug quantity for the purpose of sentencing a defendant convicted of participating in a drug-trafficking conspiracy, the court is required to make an individualized finding as to drug amounts attributable to, or foreseeable by, that defendant. In the absence of such an individualized finding, the drug quantity attributable to the conspiracy as a whole cannot automatically be shifted to the defendant.
 
 
 132
 United States v. Colón-Solís, 354 F.3d 101, 103 (1st Cir.2004); see also United States v. Sepúlveda, 15 F.3d 1161, 1197 (1st Cir.1993). On July 11, 2000, Bonilla was scheduled for his sentencing hearing before Judge Cerezo. At the hearing Judge Cerezo found that the PSR contained no findings as to the quantities or types of drugs attributable to Bonilla.[45] In accordance with the principles set out in Sepúlveda, Judge Cerezo vacated Bonilla's sentencing hearing. She then instructed the U.S. Probation Officer
 
 
 133
 to utilize methods of calculation based on these principles [in Sepúlveda] and on the evidence presented at trial which is relevant to Mr. Bonilla-Lugo. Since this case was a lengthy trial, and compliance with this order shall require the Officer to read voluminous trial transcripts, as she/(he) must do as to the other defendants waiting sentence, a term of forty five (45) days is granted for the U.S. Probation Officer to comply with this order.
 
 
 134
 A second sentencing hearing for Bonilla was held on May 10, 2002, before Judge Laffitte. However, neither Bonilla nor his counsel had received the revised PSR which Judge Cerezo had ordered.[46] Bonilla's counsel apprised the sentencing judge of this fact. The judge, who had received the updated PSR, allowed Bonilla's counsel to read the supplement. After reading it, Bonilla's counsel asked for more time, stating "I've read this memorandum, and it's wrong, Your Honor, and I need time to prove that, and I have it in the record. I can proof (sic) it from the record."[47] Specifically, Bonilla's counsel insisted that, if she had more time, she could refute the quantity of drugs that the PSR attributed to Bonilla. The sentencing judge refused to grant a continuance and sentenced Bonilla to 235 months imprisonment.
 
 
 135
 "We ordinarily review the district court's failure to continue the sentencing hearing for abuse of discretion." United States v. López-López, 295 F.3d 165, 169 (1st Cir.2002). We believe that, in this case, the district court abused its discretion by not continuing the sentencing hearing. We explain briefly.
 
 
 136
 The Probation Office's failure to provide Bonilla with a revised PSR was a violation of Rule 32(e). Judge Cerezo ordered the Probation Office to revise the PSR to include information about the quantities and types of drugs attributable to Bonilla. The Probation Office prepared the revised PSR but failed to give it to Bonilla or his counsel thirty-five days before sentencing. Bonilla did not waive his right to notice; indeed, Bonilla's counsel objected at the sentencing hearing and asked repeatedly for more time.
 
 
 137
 The government argues that any error was harmless because Bonilla's counsel had access to the trial transcripts the district court used in determining the drug quantities attributable to Bonilla. We disagree. The time limits found in Rule 32(e) and its predecessor "are no mere technicalities; they are integral to the fair and orderly process of imposing sentence. They are mandatory and we expect compliance with them." Id. Further, one reason for a PSR is so that parties do not have to comb through voluminous trial transcripts to anticipate remaining factual and legal issues. See United States v. Butler, 41 F.3d 1435, 1444 (11th Cir.1995) (stating that "the PSR facilitates the identification of factual and legal issues that remain in dispute"). Bonilla was entitled to receipt of the supplemental PSR thirty-five days before sentencing, but did not receive it until his actual sentencing hearing. His counsel objected, insisting that if she had more time, she could prove from the record that certain testimony from Martínez, on which the district court relied in determining the quantity of drugs attributable to Bonilla, was contradicted elsewhere by Martínez's own testimony. Given these facts, the complex nature of this case, and the voluminous transcripts and testimony involved, the government has not convinced us that the error was harmless. We therefore vacate Bonilla's sentence and remand for re-sentencing.
 
 4. Booker
 
 138
 Sentencing in this case occurred after the Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), but prior to its related decisions in Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and United States v. Booker, ___ U.S. ___, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). Booker, however, applies to cases pending on direct appeal at the time of its decision, 125 S.Ct. at 769, and Booker error did occur in this case insofar as the defendants were sentenced under a mandatory Guidelines system. See United States v. Antonakopoulos, 399 F.3d 68, 76 (1st Cir.2005). All appellants except for Bonilla seek remand on the basis of Booker error, although not all have preserved the error.
 
 
 139
 a. Preserved Booker error
 
 
 140
 "This court deems Booker error preserved if the defendant argued at sentencing that the sentence violated Apprendi or Blakely, or that the federal Sentencing Guidelines were unconstitutional." United States v. Gómez-Rosario, 418 F.3d 90, 109 (1st Cir.2005) (citing Antonakopoulos, 399 F.3d at 76). "Where a defendant has preserved a Booker claim, we review for harmless error, remanding for re-sentencing unless the government can show beyond a reasonable doubt that a lower sentence would not be imposed under the post-Booker regime." Id. (citing United States v. Vázquez-Rivera, 407 F.3d 476, 489 (1st Cir.2005)). Three of the appellants, Nicolai, Pizarro and Flores, have preserved Booker claims.
 
 
 141
 Nicolai asserted an Apprendi error at his sentencing, arguing that the jury failed to specify the type and quantity of drugs for which he was convicted. The government concedes that Nicolai preserved a Booker claim and also concedes that it cannot prove harmless error. We agree and remand his case for re-sentencing.
 
 
 142
 The government also concedes that Pizarro preserved a Booker claim. At his sentencing, Pizarro objected that the jury did not make a finding on the issue of drug quantity. When the district judge asserted that there was no Apprendi issue, Pizarro's counsel responded that "[w]e believe, Your Honor, that there is room in that respect." We agree with the government that Pizarro preserved a Booker claim.[48] As with Nicolai, the government also concedes that it cannot prove harmless error, and, as with Nicolai, we agree. Thus, we also remand Pizarro's case for re-sentencing.
 
 
 143
 The government does not concede that Flores preserved a Booker error. However, we see no distinction between what occurred at Flores's sentencing and what occurred at Pizarro's. At his sentencing, Flores objected that "the jury didn't render any sort of special verdict concerning the amounts [of drugs] that were attributable [to Flores]." The district court asserted that "there is no Apprendi issue," to which Flores replied "we do not concede that." Flores made the same argument that Pizarro made at his sentencing: that because the jury did not make a finding as to drug quantity he could not be sentenced above the default statutory maximum based on findings made by the judge.[49] As with Pizarro, the district judge understood the argument as an Apprendi argument and replied that there were no Apprendi issue. Also as with Pizarro, Flores expressed a belief that there was an Apprendi issue when he stated that he did not concede Apprendi. As we have stated, we have "offered to treat almost any colorable claim in the district court as preserving the Booker issue," United States v. Heldeman, 402 F.3d 220, 224 (1st Cir.2005), and we believe that Flores has preserved a Booker claim.
 
 
 144
 We must now address whether any error was harmless, i.e., whether the government has convinced us "that a lower sentence would not have been imposed had the Guidelines been advisory." Vázquez-Rivera, 407 F.3d at 489. We have characterized this standard as "extremely difficult, but not impossible... to meet." Id. at 489-90. Further, we have remanded for re-sentencing where "the government has pointed to no statement or action of the sentencing judge that would assure us that he would have imposed the same sentence in the absence of mandatory Guidelines." Id. at 490.
 
 
 145
 A review of the transcript of Flores's sentencing reveals that the sentencing judge stated that "I cannot depart ... [a]nd even if I had the discretion to depart, I wouldn't depart." However, upon a closer reading, it is evident that the sentencing judge was speaking only about departures for prosecutorial misconduct. There could very well be other reasons the district court would have departed under discretionary guidelines. We note that Flores has argued that his sentence was enhanced above the maximum sentence authorized by jury fact-finding or admitted facts, and that, in such a situation, a judge's "`factual certainty alone' in support of such enhancements `would not be sufficient to show beyond a reasonable doubt that the judge, acting under an advisory Guidelines system, would have applied the same sentence on the basis of those factors.'" United States v. Fornia-Castillo, 408 F.3d 52, 73-74 (1st Cir.2005) (quoting Vázquez-Rivera, 407 F.3d at 489-90).
 
 
 146
 Further, the district judge sentenced Flores at the low end of the guideline range, rejecting the government's request for a sentence at the upper-end of the guideline range. See Vázquez-Rivera, 407 F.3d at 490 (stating that "our doubt... is enhanced by the fact that, while the applicable Guidelines constrained the sentencing judge to the upper margin of sentences available under [the relevant statute], the sentence he chose was at the low end of that margin"). On the balance, we are not convinced beyond a reasonable doubt that Flores would not have received a lower sentence had the Guidelines been advisory. We therefore remand Flores's case for re-sentencing.
 
 
 147
 b. Unpreserved Booker error
 
 
 148
 The remaining two defendants,[50] Casas and Correy, have not preserved a Booker claim. Casas argues that he preserved a Booker claim because he objected to the computation of the drug amounts attributable to him and because the district court stated that it had "to do an Apprendi verdict." However, unlike the defendants who preserved Booker claims, Casas never actually argued Apprendi. While the district court mentioned Apprendi, it did so in an off-hand manner while responding to Casas's arguments regarding sentence disparity. Casas therefore has not preserved a Booker claim. See United States v. Martins, 413 F.3d 139, 153 (1st Cir.2005) (stating that a defendant may not "piggyback upon the court's off-hand comment [about Apprendi] ... and use it as a means of `preserving' his claim of Booker error"). Correy argues that he preserved a Booker claim because he alerted the court in a pro se motion that he had asked his counsel to object to his original PSR on Apprendi grounds, but that his counsel never made the objection. We are doubtful that this is sufficient to preserve Correy's Booker claim, as parties are generally bound by the acts of their lawyers. See Chestnut v. City of Lowell, 305 F.3d 18, 26 (1st Cir.2002). Further, although Correy filed his pro se motion before sentencing, indicating that he believed he had an Apprendi argument, neither he nor his counsel mentioned Apprendi at the sentencing hearing. Because, as we discuss below, we find plain error, we will merely assume, without deciding, that Correy failed to preserve a Booker claim.
 
 
 149
 We review unpreserved Booker claims for plain error. Antonakopoulos, 399 F.3d at 75. Defendants must satisfy a four-prong test: (1) that there was an error, (2) that it was plain, (3) that it affected substantial rights, and (4) that the error seriously impaired the fairness, integrity, or public reputation of the judicial proceedings. United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). The first two prongs are met whenever a district court treats the Guidelines as mandatory when imposing a defendant's sentence. See Antonakopoulos, 399 F.3d at 75. To meet the other two prongs, defendants must ordinarily show "a reasonable probability that the district court would impose a different sentence [that is] more favorable to the defendant under the new `advisory Guidelines' Booker regime." Id. In Antonakopoulos, we stated that a procedural error in the application of the Guidelines that would have led us to remand a case for re-sentencing pre-Booker would likely provide a basis for remanding unpreserved Booker claims. Id. at 81. We find that such an error occurred regarding both Casas and Correy in that, like Bonilla, Fed.R.Crim.P. 32(e) was violated in connection with their sentencing.
 
 
 150
 i. Casas
 
 
 151
 As we noted in our discussion of Fed.R.Crim.P. 32 and Bonilla, Judge Cerezo vacated Bonilla's original sentencing hearing because the PSR contained no findings as to the quantities or types of drugs attributable to Bonilla. Judge Cerezo also issued an order instructing the Probation Office
 
 
 152
 to utilize methods of calculation based on these principles [in Sepúlveda] and on the evidence presented at trial which is relevant to Mr. Bonilla-Lugo. Since this case was a lengthy trial, and compliance with this order shall require the Officer to read voluminous trial transcripts, as she/(he) must do as to the other defendants waiting sentence, a term of forty five (45) days is granted for the U.S. Probation Officer to comply with this order.
 
 
 153
 (emphasis added). On May 1, 2002, Casas requested that his sentencing hearing, scheduled for May 7, 2002, be continued until he received a revised updated PSR containing findings of the quantities or types of drugs attributable to him.
 
 
 154
 At his sentencing, Casas again requested a continuance. He stated that he had understood Judge Cerezo's order to apply to all the defendants and thought that his PSR "would be amended to show the [drug] calculations as to specific amounts." [2359, 5/7/02, p. 4, l. 5-6]. Casas then protested that he had never received the revised PSR. The Probation Officer stated that she had applied Judge Cerezo's order only to Bonilla and therefore did not prepare a revised PSR for anyone but Bonilla. After reading the order, the sentencing judge concluded that it applied only to Bonilla. The government then explained what evidence it relied upon regarding the quantity of drugs it believed were attributable to Casas. This explanation was based on information from the government's response to Casas's motion for a continuance. Casas, however, had not received the government's response, which had been put in the mail on May 3, 2002, two business days before the May 7 sentencing hearing. Casas's counsel objected to the evidence used by the government, arguing that he should have an opportunity to address the government's evidence with specificity. The sentencing judge initially denied this objection and began to discuss trial transcripts regarding the quantities of drugs attributable to Casas.[51] However, after Casas's counsel strenuously objected, the sentencing judge agreed to continue sentencing until 9:30 the following morning. After Casas's counsel again vigorously protested, the sentencing judge continued the sentencing hearing for three days.
 
 
 155
 On May 10, 2002, Casas again requested a continuance in order to have time to dispute the evidence relied upon by the government regarding the drug quantities attributable to Casas. This request was denied, and Casas was sentenced to 235 months imprisonment.
 
 
 156
 Casas now argues that he should be re-sentenced due to the Probation Department's failure to provide him with an updated PSR. This argument turns initially on whether Judge Cerezo's July 11, 2000 order applied to all of the co-defendants, not just Bonilla. We believe that it did. First, the language Judge Cerezo used in her order indicates that it applied to all of the defendants. The order stated that "compliance with this Order shall require the Officer to read voluminous transcripts, as she/(he) must do as to the other defendants awaiting sentence...." Second, consideration of the circumstances surrounding the order bolsters our conclusion that it applied to all of the co-defendants. All of the co-defendants had been tried before Judge Cerezo and convicted of the same count. A review of the original PSRs of several of the co-defendants, including Casas, Bonilla and Correy, reveals that they were all identical in that they did not contain findings as to the quantities or types of drugs attributable to the individual defendants.[52] In other words, all of the PSRs contained the same defect that caused Judge Cerezo to vacate the sentencing hearing of Bonilla, who was the first of the appellants scheduled for sentencing before Judge Cerezo.[53] Further, these PSRs had been submitted to Judge Cerezo prior to her order on July 11, 2000. It is highly improbable that Judge Cerezo would have ordered the Probation Office to revise Bonilla's PSR so that it contained individualized drug quantities for Bonilla but did not mean for the Probation Office to do the same for Bonilla's co-defendants who had been convicted of the same count and whose PSRs contained the same defect.
 
 
 157
 In light of the order's language and the surrounding circumstances, we conclude that the order applied to all the defendants. The Probation Office, which failed to deliver the revised PSR to Bonilla, therefore also failed to prepare a revised PSR for Casas. Like Bonilla, this is contrary to Rule 32(e)(2), in that neither Casas nor his attorney received the updated PSR at least thirty-five days prior to sentencing. See Fed.R.Crim.P. 32(e)(2).
 
 
 158
 At oral argument, the government argued that any error was harmless. We disagree, essentially for the same reasons that we found the claimed error in Bonilla's case not to be harmless. We believe this to be true even considering the fact that Casas was given a three-day continuance by the sentencing judge. In this complex case, which involved a seven-month trial with trial transcripts totaling over 8500 pages, we do not think that three days was enough time for Casas to adequately challenge the government's drug quantity calculations. Casas should have been given the thirty-five days required by Rule 32(e) to review a revised PSR.
 
 
 159
 This violation of Rule 32(e) was a procedural error that would have led us to remand for re-sentencing pre-Booker. See Antonakopoulos, 399 F.3d 68. As we stated in Antonakopoulos, such a procedural error will likely provide a basis for remanding unpreserved Booker claims. Id. Given the violation of Rule 32(e), we believe that there is a reasonable probability that the district court will impose a more favorable sentence on remand. We base this belief on the fact that, in addition to being sentenced under advisory Guidelines, Casas will have adequate time to review the trial transcripts in order to attempt to rebut the government's claim as to the amount of drugs attributable to him. We therefore remand Casas's case for re-sentencing. In doing so, we make no "suggestion or ... prediction that the sentence will necessarily be altered." Heldeman, 402 F.3d at 224.
 
 
 160
 ii. Correy
 
 
 161
 On May 16, 2000, Correy received a draft of his PSR. He filed objections on May 25, 2000 and received an amended PSR on May 26. On May 31 and June 5, Correy filed objections to the amended PSR.[54] Like Bonilla's PSR, Correy's amended PSR was based solely on the overt acts alleged in the indictment, and not on any evidence in the record. In his objections filed June 5, 2000, Correy specifically argued that the PSR should have been based on evidence in the record, and not just the overt acts alleged in the indictment. All of this occurred before Judge Cerezo's order on July 11, 2000, which, as we have already discussed, applied to all defendants.
 
 
 162
 On April 26, 2002, Correy's co-defendant Nicolai filed a motion to transfer the case back to Judge Cerezo for sentencing. Nicolai also requested a continuance of his sentencing because he had not received a draft PSR, in violation of Rule 32. On April 30, 2002, Correy filed a motion to join Nicolai's motion to transfer and noted that he, too, had not yet received a revised PSR.[55] At his sentencing hearing, Correy told the district court that he still had not received a final PSR. As with Casas and Bonilla, the district court attempted to get around the problem by referring to a trial transcript that contained witness testimony dealing with Correy's individual drug quantities.
 
 
 163
 We believe that, as with Bonilla and Casas, Rule 32(e) was violated in connection with Correy's sentencing. Correy never received a revised PSR before sentencing, as he should have pursuant to Judge Cerezo's order. Correy objected to the lack of individualized drug quantity findings and also joined a motion that made an objection based on Rule 32's thirty-five day notice requirement. While the district court referred to record evidence at Correy's sentencing, this does not change the fact that Correy never received a revised PSR. Nor are we persuaded that any error resulting from this violation was harmless, for the same reasons that we did not find that the error was harmless in Bonilla's or Casas's case. Finally, we believe that there is a reasonable probability that the district court will impose a more favorable sentence under advisory Guidelines, as Correy will have adequate time to review the trial transcripts in order to attempt to rebut the government's claim as to the amount of drugs attributable to him. We therefore remand Correy's case for re-sentencing.[56] As we noted above, this "remand should not be taken as either a suggestion or a prediction that the sentence will necessarily be altered." Heldeman, 402 F.3d at 224.
 
 5. Apprendi
 
 164
 With the exception of Bonilla, all of the appellants argued on appeal that their sentences violated Apprendi. In Apprendi, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490, 120 S.Ct. 2348.
 
 
 165
 All of the appellants were convicted of conspiracy to possess with intent to distribute approximately 1400 grams of heroin and 9445 kilograms of cocaine. Under 21 U.S.C. §§ 841(b)(1)(c) and 846, a defendant who conspires to possess with intent to distribute an unspecified amount of cocaine or heroin are exposed to a maximum sentence of twenty years' imprisonment, or thirty years if the defendant has a prior felony drug offense conviction. However, if five kilograms or more of cocaine or one kilogram or more of heroin are involved, § 841(b)(1)(A) applies and the statutory maximum becomes life imprisonment. In the instant case, the district court determined that § 841(b)(1)(A) applied. Therefore, the statutory maximum encompassed life imprisonment.
 
 
 166
 Appellants argue that the jury did not determine the amount or quantity of drugs, and that, therefore, the default statutory maximum of twenty years found in § 841(b)(1)(c) should have applied. The government argues that the jury instructions forged the necessary link between the indictment and the verdict so that the statutory maximum should be life imprisonment.
 
 
 167
 This court addressed the relationship between Apprendi and Booker as to drug quantity determinations in United States v. Pérez-Ruiz, 421 F.3d 11 (1st Cir.2005). Although no defendant can be sentenced under the guidelines beyond a statutory minimum, under Booker a judge may make the drug quantity findings necessary to trigger a statutory maximum. Id. at 12. As we said in Pérez-Ruiz,
 
 
 168
 [u]nder the 5-4 constitutional ruling in Booker, judge-made enhancements under the guidelines that result in a sentence greater than the sentence that could be imposed based solely on the facts found by the jury do amount to Sixth Amendment violations if the guidelines are treated as mandatory; but under the companion 5-4 remedial ruling in Booker, this problem is washed out by treating the guidelines as advisory. A defendant sentenced under the mandatory regime may be entitled to re-sentencing under the advisory one[,] ... but Booker both created and cured the constitutional error at the same time.
 
 
 169
 Id. Given the jury instructions, there is some doubt about the correctness of the government's argument that the problem of drug quantity was taken care of by the jury verdict that found the defendants guilty as conspirators. That is beside the point because the evidence overwhelmingly establishes that the conspiracy involved at least five kilograms of cocaine or one kilogram of heroin, which are the amounts necessary to support a statutory maximum of life imprisonment.[57] See United States v. Soto-Beníquez, 356 F.3d 1, 48 (1st Cir.2004) (stating that, for Apprendi purposes, "the conspiracy-wide drug quantity determines the statutory maximum").[58] The two main government witnesses, Pérez and Martínez, were co-conspirators who testified that they moved various shipments of cocaine and heroin totaling thousands of kilograms of cocaine and hundreds of kilograms of heroin. The government also had at least seven other co-conspirators testify to various amounts of cocaine and heroin that well-exceeded the threshold necessary for § 841(b)(1)(A) to apply.
 
 
 170
 In the face of this evidence, appellants attempt to attack the credibility of Pérez and Martínez and quibble with the evidence regarding the amounts attributable to them individually. However, they point to no evidence contradicting the conspiracy-wide drug quantities testified to at trial, nor do they offer any explanation for why the jury would believe the government witnesses regarding each appellant's activities in furtherance of the conspiracy, yet discredit their testimony regarding the type or quantity of drugs involved in the conspiracy. See id. at 47 (stating pre-Booker that we have found an Apprendi error harmless where "the jury could not have convicted without crediting informant testimony, the same informant testified to the drug amount, and the defendant offered no reasons to disbelieve the testimony except a general attack on the witness's credibility"). Because the evidence is overwhelming, on remand for re-sentencing the appropriate statutory maximum will be life imprisonment as stated in § 841(b)(1)(A).
 
 C. Custody of Nicolai
 
 171
 We turn to one final issue. When Nicolai was indicted in Puerto Rico, he was already serving a sentence of eleven years to life in New York state prison after pleading guilty to conspiracy to possess with intent to distribute narcotics. Nicolai was transferred to federal custody in Puerto Rico pursuant to a writ of habeas corpus ad prosequendum ("writ") issued in October 1996. At his sentencing on July 31, 2002, Nicolai asked that he be transferred back to New York state prison in order to be closer to his family. On September 17, 2002, the sentencing judge executed an Amended Judgement of Conviction. In committing Nicolai to the care of the United States Bureau of Prisons ("BOP"), the sentencing judge recommended that Nicolai serve his sentence in the state of New York. The sentencing judge noted that his recommendation was non-binding because "any decision regarding prison assignment or custody falls squarely within the power of the executive branch." On September 27, 2002, the New York Department of Correctional Services received a letter from the U.S. Attorney requesting that New York release jurisdiction of Nicolai so that he could serve his federal sentence in federal prison. It complied, and Nicolai is currently in federal prison.
 
 
 172
 Nicolai now argues that under the Interstate Agreement on Detainers Act ("IADA"), 18 U.S.C.App. 2 § 2, he must be returned to New York state prison because that is where he was before he was transferred to federal custody pursuant to the writ. We disagree. From our review of the record, it appears that Nicolai was brought into federal custody by means of a writ of habeas corpus ad prosequendum, not a detainer.[59] While the use of a detainer invokes the IADA, the use of a writ of habeas corpus ad prosequendum does not. United States v. Mauro, 436 U.S. 340, 349, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978); United States v. Beard, 41 F.3d 1486, 1489 (11th Cir.1995). Therefore, the IADA is inapplicable.
 
 
 173
 We note further that, generally, a state that sends a prisoner in state custody to federal authorities pursuant to a writ of habeas corpus ad prosequendum retains jurisdiction over the prisoner because the prisoner is merely "on loan" to the federal authorities. See, e.g., Jake v. Herschberger, 173 F.3d 1059, 1062 n. 1 (7th Cir.1999); United States v. Evans, 159 F.3d 908, 912 (4th Cir.1998); Thomas v. Brewer, 923 F.2d 1361, 1366-67 (9th Cir.1991). However, in the instant case, the federal and state authorities reached an agreement allowing the United States to keep Nicolai in federal prison. See Weekes v. Fleming, 301 F.3d 1175, 1181 (10th Cir.2002) (stating that a state may choose "to relinquish or transfer its primary custody to the United States"). We therefore find no error in Nicolai's confinement in federal prison.
 
 III. Conclusion
 
 174
 For the foregoing reasons, the appellants' convictions are affirmed. We vacate their sentences and remand for re-sentencing consistent with this opinion.
 
 
 175
 
 Appellants convictions are affirmed, and their sentences vacated and remanded for re-sentencing.
 
 
 
 
 Notes:
 
 
 [1]
 Pérez was one of the leaders of the conspiracy. He was eventually arrested and chose to cooperate with the government. He was one of the government's chief witnesses at appellants' trial
 
 
 [2]
 We note that co-appellants Casas, Nicolai, and Pizarro seek to adopt by reference all of the issues and arguments raised by their co-appellants, while Flores-Plaza ("Flores") seeks to adopt by reference certain arguments of Bonilla and CorreySee Fed. R.App. P. 28(i). "Adoption by reference. . . cannot occur in a vacuum; to be meaningful, the arguments adopted must be readily transferrable from the proponent's case to the adopter's case." United States v. David, 940 F.2d 722, 737 (1st Cir.1991) (citing United States v. Zannino, 895 F.2d 1, 17 (1st Cir.1990)). It is also settled that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." Zannino, 895 F.2d at 17. We apply that rule here. In this complex case involving numerous issues of both fact and law, appellants have argued that their arguments derive from the same legal and factual positions of their co-defendants. However, they have failed to explain why this is so beyond noting that they were co-defendants in the district court, were tried in front of one judge, and were sentenced by another judge. "It is not enough merely to mention a possible argument . . ., leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." Id. Because appellants have argued for adoption by reference in a perfunctory manner, we deem the arguments waived.
 
 
 [3]
 Nothing in the record before us indicates that Pizzaro actually joined Nicolai's motion. However, as it makes no difference to our decision on this issue, we will proceed on the assumption that Pizarro did in fact join Nicolai's motion
 
 
 [4]
 The language of the co-defendant exception suggests that initial appearances of co-defendants from whom appellants were later severed would also delay the start of the STA clock, provided the appearance occurred prior to severanceSee 18 U.S.C. § 3161(h)(7) (excluding delays "when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted"); cf. United States v. Rojo-Álvarez, 944 F.2d 959, 965 (1st Cir.1991) (treating severed defendant separately "with regard to further speedy trial calculations" after date of severance) (emphasis added). Nonetheless, we need not decide the issue because even counting from November 6, 1996, we find that the seventy-day time limit was not exceeded.
 
 
 [5]
 We pause to note that this was just one of many examples of poor briefing by the government. In a case of this magnitude and complexity, careful attention to both the legal claims made by appellants and the record evidence in support or opposition thereof is required. By no means do we suggest that the appellants' briefs are beyond reproach, but we have been particularly disappointed with the inadequacy of the government's briefing, which failed even to mention certain substantive claims raised by the appellants
 
 
 [6]
 It does not, in any case, appear from appellants' briefs that they dispute the government's assertion that if co-defendants' motions toll their STA clock, the seventy-day limit was not expired
 
 
 [7]
 It is true that, "in contrast to the potentially unreasonable time that is excluded from STA calculations when a hearing is required, only 30 days may be excluded when a hearing is not required."See Maxwell, 351 F.3d at 38-39; 18 U.S.C. § 3161(h)(1)(J). However, even considering this in our calculations, the seventy-day limit was not exceeded.
 
 
 [8]
 Due to the complexity and length of this case, we have included citations to the record below in this opinion. Citations to a docket entry are indicated by "(Docket No. ___)." Citations to trial transcripts are to the date and page number and indicated, e.g., "(TT 6/2/99: ___)." Citations to the Appendix are indicated by "(Appendix: ___)."
 
 
 [9]
 Correy also filed notice of an interlocutory appeal on January 12, 1999, although the appeal was voluntarily dismissed on June 9, 1999
 
 
 [10]
 We note that four of the appellants — Nicolai, Correy, Pizarro, and Bonilla — filed motions to continue trial
 
 
 [11]
 We note that Nicolai was serving a sentence of eleven years to life on New York state drug charges and so would have been incarcerated during the forty-one months before trial in any case. He was, however, transferred to Puerto Rico for pretrial detention, resulting in further separation from relatives in the New York area
 
 
 [12]
 Bonilla does not contend that Martínez's statements at trial contradicted statements he made before the grand jury, but rather that, at trial, Martínez stated that Bonilla participated in certain events although he had not mentioned Bonilla's participation in the same events to the grand jury
 
 
 [13]
 We have previously noted that even "prosecutorial efforts to mislead a grand jury into returning an indictment normally may be addressed by more measured means" than dismissal of the indictmentMangual-Corchado, 139 F.3d at 42 n. 17.
 
 
 [14]
 Two additional issues, raised by appellants under the heading of prosecutorial misconduct, are addressed separately belowSee infra at 53 (failure to disclose newly discovered evidence of witness' criminal conduct), 93 (alleged violation of Interstate Agreement on Detainers, 18 U.S.C. app. § 2).
 
 
 [15]
 Pérez and Martínez were indicted with the appellants but pled guilty early on. We use the term "sentencing courts" because Pérez was sentenced by Judge Laffitte, while Martínez was sentenced by Judge Cerezo. Judge Cerezo was the trial judge in appellants' case, while Judge Laffitte was the sentencing judge in appellants' case
 
 
 [16]
 The BOL reflected responsibility for only five to fifteen of the eighty-one kilograms charged in the indictment. Assistant U.S. Attorney ("AUSA") Jeannette Mercado indicated that the BOL of thirty-two was an oversight, and should have been 34, reflecting responsibility for twenty kilograms, one-fourth of the total volume of cocaine seized. (TT 11/2/99: 74-76). She also testified that the other three defendants who pled guilty for the eighty-one kilograms were held responsible for only twenty (TT 11/2/99: 74), although at least one testified that he had accepted responsibility in his guilty plea for twenty-seven kilograms. (TT 8/19/99: 50)
 
 
 [17]
 Pérez's pre-sentence report indicated that AUSA Mercado had "described the defendant as having assumed a minor role within the organization." At trial, AUSA Mercado admitted that she did not correct this statement, and opined that perhaps she had interpreted "the organization" to include only the four persons indicted on the eighty-one kilogram charge. (TT 9/2/99: 30-31)
 
 
 [18]
 The court found that the statutory minimum sentence of ten years was to be disregarded, in accordance with 18 U.S.C. § 3553(f)
 
 
 [19]
 As we stated in footnote 14,supra, Judge Cerezo sentenced Martínez and also presided over appellants' trial.
 
 
 [20]
 Casas argues that the district court's denial of his motion to vacate the verdict and dismiss the indictment on grounds of prosecutorial misconduct is an error of constitutional dimension. But the government's use of deception to secure a sweetheart deal for Pérez and Martínez, though improper, did not infringe on appellants' constitutional rights. Moreover, while we will not engage inpost hoc speculation about whether these defendants would have cooperated as witnesses had their plea agreements been reflective of their actual culpability, we note that both plea agreements explicitly stated that the United States reserved the right to bring additional relevant facts to the attention of the probation department and to dispute facts material to sentencing, and that the sentencing court could exercise its discretion to apply a sentence up to the statutory maximum.
 
 
 [21]
 CitingTerry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), Casas argues that the trial testimony of Pérez and Martínez ought to be excluded as fruit of a poisonous tree. See id. at 32-33. We decline, however, to apply the exclusionary rule, as there are less drastic means of deterring prosecutorial misconduct — including professional sanctions — without conflicting with the public's interest in the punishment of criminal activity. See United States v. Hasting, 461 U.S. 499, 506, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (finding "deterrence is an inappropriate basis for reversal where ... means more narrowly tailored to deter objectionable prosecutorial conduct are available").
 
 
 [22]
 We note that, although completed on June 24, 1999, Martínez's supplemental agreement was not provided to the defense prior to its use during his direct examination, on September 21, 1999. (TT 9/21/99: 9-10)
 
 
 [23]
 AUSA Fernández volunteered during these proceedings that he had discussed helping another cooperating witness, Wilson Rodríguez-Peláez, to obtain a sentence reduction in criminal proceedings against him in the Southern District of Florida. (TT 8/24/99: 60-61)
 
 
 [24]
 For the same reasons, we find that no prejudice resulted from the late disclosure of portions of Pérez's presentence report that contained impeachment evidence. At Nicolai's request, the district court reviewed in camera the presentence reports of Pérez and ordered that the portions thereof relevant for impeachment purposes be provided to the defense. (Docket No. 1335). Nicolai used the presentence report at length during his cross-examination of Pérez. (TT 6/15/99: 54-85). In addition, the probation officers who prepared presentence reports on Pérez and Martínez both testified about the information each witness provided them
 
 
 [25]
 We note that there was some ambiguity about whether the sequestration orders prohibited the discussion of testimony Pérez had given to date — in which case they would not have precluded his discussion of the murders, about which he had not yet testified — or also of any future testimony he expected to give. (TT 6/2/99: 81-82)
 
 
 [26]
 Correy's argument that similar sequestration orders for government witness Carlos Pérez-Delgado were violated when AUSA Fernández and Agent Stoothoff spoke with him on May 27, 1999 lacks merit. Carlos Pérez-Delgado had not testified as of that date, and Correy has not argued that he was under any sequestration order prior to testifying
 
 
 [27]
 In light of our conclusions,infra, regarding sentencing, we find it unnecessary to consider Bonilla's related claim that the government made false representations about his activities and weapons possession to the sentencing judge.
 
 
 [28]
 Nicolai frames his argument in terms of the government's failure to corroborate the witnesses' claims, rather than a knowing presentation of false testimony. We construe this argument as asserting that the government should have known that testimony upon which it relied was false
 
 
 [29]
 We note that the evidence in question was collected by the local law enforcement authorities, and Bonilla has not argued that it was ever in the possession of the federal investigators or prosecutors
 
 
 [30]
 Apparently, this juror was attracted to Nicolai and was therefore jealous of Nicolai's wife
 
 
 [31]
 While the transcript's spelling of the word is "cabesilla", the correct spelling is "cabecilla."See The New Revised Velázquez Spanish and English Dictionary 123 (1984).
 
 
 [32]
 Appellants argue that a presumption of prejudice is required in the instant case because unauthorized communications occurred between jurors and persons associated with the caseSee Gastón-Brito, 64 F.3d 11, 13 (1st Cir.1995) (deeming such communication "`presumptively prejudicial'" and requiring "`a sufficient inquiry to determine whether the communication was harmless'") (quoting United States v. O'Brien, 972 F.2d 12, 14 (1st Cir.1992)). They suggest that outside contact came in the form of a list of defendants' names posted on a bulletin board near public telephones used by jurors, which had the initials "UC" next to those defendants who were under custody during trial. Even with a presumption of prejudice, however, the court's voir dire of each juror was sufficient inquiry to determine that any such communication was harmless.
 
 
 [33]
 We note that each juror was dismissed for the day following his or hervoir dire.
 
 
 [34]
 Appellants note that the juror never answered that question, but this is so because, when asked to clarify a second time, the trial judge changed tack and asked a different question. In addition, appellants suggest that the juror's lack of either comprehension or candor was apparent in her denial of "hav[ing] any opinion" about whether any of the defendants were in jail. This presumes that she knew that at least one defendant was indeed in jail. There is no evidence that this was the case. Indeed, the juror responded in the negative when asked if she had discussed or heard other members of the jury discussing whether any of the defendants had been detained
 
 
 [35]
 Pérez testified that Ratón was a member of his organization (TT 5/24/99: 34-35) and that Ratón was a TWA employee who assisted in the smuggling of drugs in carry-on bags through the airport at Isla Verde (TT 5/25/99: 16) by passing them through security and returning them to other members of the conspiracy once inside. (TT 5/25/99: 35)
 Vélez testified for the government about an occasion when he and Pizarro had received bags of cocaine from Ratón at a bar inside the secure part of the TWA terminal (TT 8/12/99: 149-52) and described two instances in which he went to a restaurant on the unsecured side of the airport to deliver bags containing drugs to Ratón, who took them away in wheeled garbage bins. (TT 8/13/99: 26-27, 41-42). On one of those occasions, Vélez testified, Ratón returned the bags to him on the secure side before he boarded a flight to New York. (TT 8/13/99: 29-30).
 Martínez-Medina testified about an instance in which Ratón met him inside the secure TWA terminal and lead him to a cafeteria where he had two bags containing drugs (TT 8/19/99: 77), and two occasions when he delivered bags containing cocaine to Ratón at a bar on the unsecured side of the TWA checkpoint, which Ratón then placed into a garbage cart and carried past security. (TT 8/23/99: 9-16). He also described having communicated with Ratón over the phone and in person about when Ratón would return to work after an accident, and whether someone else could take over the role of moving drugs past security in the interim. (TT 8/19/99: 88-90).
 
 
 [36]
 Elizabeth Morales, another cooperating witness, testified that she had dropped off bags of drugs in an airport restaurant to be picked up by a contact person wearing a dark green or grey maintenance uniform (TT 8/12/99: 73-74), although she had never looked at his face and so could not identify him. (TT 8/11/99: 1020). Vélez described Ratón as a young white man dressed like the airport janitors in a dark blue uniform, but did not know his name and was unable to identify him in the courtroom, despite Flores' presence. (TT 8/12/99: 149-52). Martínez-Medina described Ratón as wearing the uniform of the Port Authority, which consisted of a blue shirt and dark slacks. (TT 8/19/99: 77-78). Martínez, another cooperating witness, described being introduced to a young man who was the organization's "connection in the airport," who had a dark complexion and wore a brown uniform. (TT 9/21/99: 55-56)
 
 
 [37]
 Pizarro's request to join Nicolai's motion for a new trial (Docket No. 2280) was denied, the court having already ruled to deny Nicolai's motion, on the same ground as the denial of Nicolai's motion. (Docket No. 2313)
 
 
 [38]
 The motion was filed after this case was transferred from Judge Cerezo to Judge Laffitte pursuant to the order of the First Circuit Judicial Council
 
 
 [39]
 Because Pizarro's request to join the motion for a new trial was denied, the district court did not evaluate the strength of the evidence that would have remained against him had Pérez's credibility been completely destroyed. We find that the evidence of Pizarro's participation in the Count One conspiracy was such that even had the jury disbelieved all of Pérez's testimony, its verdict with regard to Pizarro would not likely have been altered. Despite some inconsistencies in their recollections, both DEA agents who were at the Carolina airport when the March 21, 1994 attempt to smuggle drugs was interrupted identified Pizarro as having been present and having escaped in a TransAm. In addition, seven cooperating witnesses, including Martínez and Martínez-Medina, identified Pizarro as a member of the conspiracy and described his role and specific activities therein
 
 
 [40]
 Appellants note that the trial judge expressed disagreement with the reassignment of this and two other of her criminal cases. (Docket No. 2516)
 
 
 [41]
 It is true that Flores filed a request for all of the transcripts on December 23, 1999. (Docket No. 1658). However, it appears that the transcripts that he wanted were provided pursuant to an order issued by Judge Cerezo on February 29, 2000. This order instructed the court reporter to prepare transcripts of certain witnesses' testimonies and stated that it had considered Flores's motion. It appears that Judge Cerezo considered Flores's motion, along with the motions of the other appellants, before ordering the transcripts she felt were relevant to their sentencing. (Docket No. 1715)
 
 
 [42]
 While we reach no decision on whether the lack of transcripts in and of itself warranted re-sentencing, we note that the lack of transcripts available at sentencing plays a role in our analysis of theBooker claims of Casas and Correy, which we discuss below.
 
 
 [43]
 In this section, we discuss Fed.R.Crim.P. 32(e) only as it relates to Bonilla, who did not make aBooker argument to this court. However, Rule 32(e) is also relevant to Booker arguments made by Casas and Correy, which we discuss infra.
 
 
 [44]
 At the time of Bonilla's sentencing, the notice requirements for PSRs were found in Fed.R.Crim.P. 32(b). Per amendments effective December 1, 2002, Rule 32 was renumbered and the notice requirements were moved to Rule 32(e)
 
 
 [45]
 The offense conduct in the PSR was based solely on the overt acts alleged in the indictment as to the entire conspiracy. However, the jury did not issue a special verdict or rule on the overt acts alleged in the indictment. The PSR thus contained no findings as to drug type or quantities attributable to Bonilla based on evidence in the record
 
 
 [46]
 The Probation Officer confirmed this fact at the sentencing hearing, telling the sentencing judge that "I was directly ordered by the Honorable Judge Cerezo, and my response was sent directly to her. I was not ordered to disclose that information to any of the parties." The record does not show any such limitation on disclosure being ordered by Judge Cerezo and, of course, it would be improper for the Probation Office to fail to disclose to counsel a PSR that was to be relied upon by the court
 
 
 [47]
 While counsel did not utter the word "continuance," it is obvious from her statement that she was requesting a continuance
 
 
 [48]
 We recently found that, where a district judge,sua sponte, mentioned that there were no Apprendi problems in sentencing, we would not "allow the defendant to piggyback upon the court's off-hand comment ... and use it as a means of `preserving' his claim of Booker error." United States v. Martins, 413 F.3d 139, 153 (1st Cir.2005). Pizarro's situation is distinguishable from the situation in Martins in that the district judge's mention of Apprendi was not an off-hand comment but was a response to Pizarro's objection, which by its nature raised Apprendi concerns.
 
 
 [49]
 In hisApprendi argument, Nicolai also objected that "the jury was not given a special verdict and that jury did not come back with specific quantities."
 
 
 [50]
 Bonilla has not argued aBooker error before us.
 
 
 [51]
 As we have noted, the sentencing judge relied solely on testimony of Martínez in determining the quantity of drugs attributable to Casas
 
 
 [52]
 As with Bonilla, the offense conduct in the other PSRs was based solely on the overt acts alleged in the indictment as to the entire conspiracy and not evidence in the record, even though the jury did not issue a special verdict or rule on the overt acts alleged in the indictment
 
 
 [53]
 While Bonilla was the first of the appellants scheduled for sentencing before Judge Cerezo, Casas was the first scheduled for sentencing before Judge Laffitte
 
 
 [54]
 At his sentencing hearing on May 7, 2002, the government claimed it had not received objections to the amended PSR. However, the docket sheet shows entries on both May 31, 2000 and June 5, 2000 for objections by John Correy to his amended PSR
 
 
 [55]
 It is unclear whether Correy based his objection on Judge Cerezo's order or on the fact that there had been no response to his June 2, 2000 objection that the PSR was based solely on statements in the indictment and not on evidence in the record. However, we do not believe it makes any difference, as the substance of Correy's objection, that the PSR did not contain any findings as to the quantities of drugs attributable to him individually, remained the same
 
 
 [56]
 We note that at the sentencing hearings of Casas, Correy, and Bonilla, the appellants attempted to call into question the credibility of Martínez, whose trial testimony the sentencing judge used in determining the drug quantities attributable to each appellant. The sentencing judge rejected these arguments, reasoning that he did not "have to give credibility nor does [the trial judge] have to give credibility to [Martínez's] testimony. It went to the jury, and the jury credited that testimony." (Docket No. 2362 at 15; Docket No. 2360 at 23; Docket No. 2369 at 10). However, there is no way of knowing what portions of Martínez's testimony the jury credited because the jury issued no special verdict and did not rule on the overt acts alleged in the superseding indictment. Indeed, Correy and Nicolai were acquitted of the murders that Martínez testified they committed, so it is clear that at least some portion of his testimony was not credited. We wish to clarify that the jury verdict of guilty did not determine the amount of drugs attributed to each defendant. As a result, the testimony of Martínez as to drug quantity was not necessarily accepted as credible by the jury. Any conclusion as to individual drug quantity should be based on review of the entire record
 
 
 [57]
 We note that Casas has not established anApprendi violation at all. Casas was sentenced to 235 months' imprisonment, which is five months less than the default statutory maximum. There is therefore no Apprendi violation regarding his sentence. See United States v. Goodine, 326 F.3d 26, 33 (1st Cir.2003) (stating that even if drug quantity "influences the sentence, but the resulting sentence is still below the default statutory maximum, there is no Apprendi violation").
 
 
 [58]
 Certain appellants appear to argue that theApprendi violation was that the jury failed to determine that amount of drugs that were attributable to them individually. However, we have consistently held that, for Apprendi purposes, it is the drug quantity attributable to the entire conspiracy that determines the statutory maximum. See, e.g., Soto-Beníquez, 356 F.3d at 48.
 
 
 [59]
 While Nicolai states that he was moved to Puerto Rico via a "detainer pursuant to a writ by the District of Puerto Rico," he does not point to any evidence that supports this assertion